*402 NIES, Circuit Judge.
The United States appeals from the judgment of the U.S. Claims Court[2] holding the United States liable under the income-sharing provisions of the Randolph-Sheppard Vending Stand Act, 20 U.S.C. §§ 107-107Í (1982), to the Texas State Commission for the Blind and the State of Texas (collectively hereafter, TSCB) for income derived from vending machines operated by the military exchanges of the Department of Defense. We reverse.
I.
This appeal involves a question of statutory interpretation of the Randolph-Sheppard Act (the Act). More precisely, the issue is whether a regulation of the Department of Defense (DOD) reasonably interprets the scope of the statutory exemption provided for military exchanges from the requirements of the Act that income from vending machines on federal property be shared with blind vendors and/or state blind agencies.
In 1936, Congress passed the Randolph-Sheppard Act, Ch. 638, 74 Stat. 1559 (1936) (current version at 20 U.S.C. §§ 107-107Í (1982)), to provide blind persons with remunerative employment and economic opportunities by permitting them to operate vending stands in federal buildings. The program was only moderately successful. Part of the problem was general apathy to the program among the agencies. In addition, civilian employee welfare and recreation groups were being permitted by agencies to place vending machines in federal buildings to finance the activities of such groups. The competition from these machines diverted income from blind vendors and made the establishment of new vending stands economically unattractive.
The practice of allowing employee groups, such as unions, to utilize federal property free of charge and to retain the funds without any accountability was of questionable legality. In 1952, the Comptroller General issued an opinion advising the Attorney General that funds derived from vending machines at the Federal Bureau of Investigation were received “for the use of the United States” within the meaning of that phrase in 81 U.S.C. § 484 and were required to be deposited into the Treasury as miscellaneous receipts. Comp. Gen.Dec. B-111,086, 32 Comp.Gen. 124 (1952). In view of that opinion, the Comptroller General, in a related opinion that year, ruled that the practice of allowing postal employee groups to install vending machines on federal property and retain the profits was of “doubtful” legality. However, the Comptroller General concluded that his office would “interpose no objection to the continued use of proceeds by employee groups” pending action on clarifying legislation which the Controller General had recommended to Congress.[3]
In 1954, Congress amended the Randolph-Sheppard Act to make it more effective. Amendments to the Randolph-Sheppard Vending Stand Act, Pub.L. No. 83-565, § 4, 68 Stat. 663 (1954). These amendments mandated that blind vendors be given a “preference,” so far as feasible, in establishing new stands on federal property and authorized the heads of agencies to assign vending machine income to blind vendors with whom vending machines directly competed in order to assure such “preference.” However, it appears that the assignment of income power was virtually ignored. In 1962, Senator Randolph, in proposing further amendments to improve the opportunities for the blind, specifically recognized that vending machines of civilian employee groups were the source of the problem and urged that such groups could and should find “other means of financing [their] projects.” Operation of Vending Stands for the Blind in Federal Buildings: Hearing on S. 39J¡. Before *403 the Special Subcomm. of the Senate Comm, on Government Operations, 87th Cong., 2d Sess. 10 (1962).
In 1974, over strong opposition by civilian employee groups, particularly the Postal Workers Union, significant changes were made in the Act because of continued congressional dissatisfaction with the limited expansion of the blind vendor program. Randolph-Sheppard Act Amendments, Pub.L. No. 93-516, Title II, 88 Stat. 1622 (1974). These amendments were in large part, again, the result of the efforts of Senator Randolph and included provisions by which blind vendors were given “priority” (not merely a preference) in operating new facilities so as to increase their numbers; the items allowed to be sold were expanded; and income from vending machines—with some exemptions—was required to be shared either with blind vendors directly or with state agencies for the blind. The sharing percentages are 100% for machines in direct competition with blind vendors; 50% where there is no direct competition unless at least half of the hours worked on the premises where the machines are located are outside normal working hours; and 30% in the latter case. 20 U.S.C. § 107d-3(b)(l) (1982).
The exemption provided in the 1974 amendments, which concerns us here, is found in 20 U.S.C. § 107d-3(d) (1982) and provides:
Subsections (a) and (b)(1) [income sharing] of this section shall not apply to income from vending machines within retail sales outlets under the control of exchange or ships’ stores systems authorized by title 10, or to income from vending machines operated by the Veterans Canteen Service, or to income from vending machines not in direct competition with a blind vending facility at individual locations, installations, or facilities on Federal property the total of which at such individual locations, installations, or facilities does not exceed $3,000 annually. [Emphasis added.]
A DOD regulation, 32 C.F.R. § 260.-3(i)(3)(i) (1985), interprets this exemption to exclude:
Income from vending machines operated by or for the military exchange or ships’ stores systems.
A number of state agencies, TSCB being one, nevertheless, sought to share in the income of military exchanges. In May, 1979, TSCB filed a complaint with HEW which resulted in the convening of an arbitration panel, as provided in the statute (20 U.S.C. § 107d-l(a) (1982)), to adjudge the validity of its asserted right to a share of vending machine income of the military exchanges. TSCB argued that the statutory exemption covered only those vending machines of the military exchanges physically located within the four walls of military exchange stores.
In a split decision, the arbitration panel of three held that the position of TSCB was the correct interpretation of the statute. Texas (Texas State Commission for the Blind) v. Department of Defense, No. RS 79-4 (Sept. 2, 1981). The majority of the arbitrators stated that the statutory language did not “appear to be ambiguous.” Slip op. at 11. “Within retail sales outlets,” per the two arbitrators, would normally be understood to mean “inside the four walls of an exchange system store.” They then recognized that “within” could also mean “a part of” but concluded that this would render the phrase “retail sales outlets” meaningless. Slip op. at 11-12. On the other hand, the unequivocal legislative history against reaching income of the military exchanges raised questions in their minds as to the “clarity” of the language. Slip op. at 12. Ultimately, the two arbitrators resolved the question of the scope of the military exemption by reliance “on the general intent and approach of the legislation itself. These facts argue for a narrow reading of any limitation on opportunities for the blind.” Slip op. at 15. To be exempt, they concluded, vending machines had to be “within the four walls of an exchange system store” but “expressly [did] not decide the issue of whether vend *404 ing machines directly outside retail sales outlets are to be deemed inside or outside these stores.” Slip op. at 18 and n. 27. The majority found final support for its position in regulations of the Department of Health, Education and Welfare (HEW), the principal agency under the Act charged with its administration. The majority did not rely on specific language in the HEW regulations (the regulations simply repeat the statute), but on HEW’s refusal to amend its regulations to include the broad exemption language requested by DOD. Slip op. at 16-17.
The dissenting arbitrator, in reaching his conclusion that DOD’s position was correct, relied on the essentially different nature of the military exchanges from civilian employee welfare and recreation groups. Through the profits generated by military exchanges, essential governmental support services were provided for military service personnel and their families. He noted that extracts from Congressional Hearings and Reports of record dated 1949, 1953, 1970, 1972, 1974, 1978 and 1979 on non-Randolph-Sheppard legislation established that this arrangement had been recognized and approved by Congress as mutually beneficial to service personnel and to the public fisc. In his view, the legislative history unequivocally indicated that the military exchange systems were intended to be exempt and that that purpose could be given effect without a strained reading of the words of the statute.
In the minority arbitrator’s view, the statutory language had no “plain meaning.” Indeed, TSCB had conceded that the statutory words “retail sales outlet” and “within” were susceptible to more than one interpretation, and the majority opinion had expressly left open the question whether vending machines directly outside exchange stores should be deemed “within” such stores under the statute. The “plain language” of the statute seen by the majority, in his words, “turned out not to be so plain.”
Following the decision of the arbitration panel, on September 2, 1981, TSCB sought to obtain enforcement of the arbitration decision by the Department of Education (DOE), which had succeeded to HEW’s authority under the Randolph-Sheppard Act. Act of October 17, 1979, Pub.L. No. 96-88, Title VI, 93 Stat. 696. In the interim, the State of Oklahoma had initiated litigation in federal district court against DOD on a comparable claim to military exchange income.[4] Because of the conflict between the interpretations of the statute by two government departments (DOE and DOD), DOE referred the matter to the Department of Justice for resolution, as required by Executive Order No. 12,146, 3 C.F.R. § 409.411 (1980). On February 1, 1982, the Department of Justice advised that it resolved the conflict in favor of DOD. Therefore, the Department of Justice undertook to defend the Oklahoma suit on the basis of DOD’s interpretation.
The decisions in the Oklahoma litigation are reported at Oklahoma v. Weinberger, 582 F.Supp. 293 (W.D.Okla.1982), aff'd, 741 F.2d 290 (10th Cir.1983). In sum, those courts held that the statutory language was not without some ambiguity as evidenced by the changes in HEW’s position during the drafting of its own regulations.[5] In their view, the proposed narrow interpretation was contrary to the intent of Congress, since limiting the exemption to vending machines physically within exchange stores would effectively deprive the exchanges of any exemption. On the other hand, the DOD regulation, endorsed by the Department of Justice, was consistent with the statutory language, the purpose of the exemption, and congressional intent in the *405 overall purpose of the Act. Thus, both the Oklahoma district court and the 10th Circuit held DOD’s regulation valid.
The suit by TSCB, seeking enforcement of the arbitration award in its favor, was filed in the United States Claims Court in March, 1983. The Claims Court rendered its decision, upholding the award, after the 10th Circuit decision, thereby creating a clear conflict in interpretation.
The Claims Court’s decision turned particularly on the meaning of the statutory term “within.” The common usage of the term, per the court, “contemplates spatial boundaries.” 6 Cl.Ct. at 738. The court discounted the significance of the legislative history relied on by the 10th Circuit since the Claims Court considered the history to be “at odds” with the concept of “within physical boundaries.” 6 Cl.Ct. at 740. A particular colloquy on the House floor between Messrs. Brademas and Sikes (which specifically supports DOD’s interpretation) was discounted because it occurred after the Senate passed the bill and could not have been considered by that body.[6] Id. at 741. The Claims Court viewed other portions of the legislative history as supporting TSCB’s position because of the use of the words “retail outlet” therein which, in its understanding, meant a store.[7] Id. at 740. The court also noted the Conference Report characterizing the exemption as excluding “certain locations.” Id. citing S.Rep. No. 1270, 93rd Cong., 2d Sess. 35 (1974); H.R.Rep. No. 1457, 93rd Cong., 2d Sess. 35 (1974). Further, the legislative history’s reference to the Marine Corps base in Albany, Georgia, as a “model” because of the number of blind vendors was seen to overcome DOD’s argument that the income-sharing provisions were directed to the civilian groups only. 6 Cl.Ct. at 741.
Finally, since the majority of vending machines on DOD-controlled property are operated by the exchange system, the congressional purpose of the act would be frustrated, per the Claims Court, if these were exempt. To avoid “nullifying” the statute, the court ruled in favor of TSCB. Id. at 741-42.
The court certified the question of statutory interpretation to this court which accepted jurisdiction.[8]
II.
Upon consideration of the statutory language, the legislative history, the purpose of the exemption, and the status of the military exchanges as non-appropriated fund instrumentalities performing essential *406 governmental services, we conclude that the Claims Court erred in voiding the DOD regulation.
The task before us of interpreting the statutory language of the military exchanges exemption is succinctly summarized in United States v. Turkette, 452 U.S. 576, 580, 101 S.Ct. 2524, 2527, 69 L.Ed.2d 246 (1981):
In determining the scope of a statute, we look first to its language. If the statutory language is unambiguous, in the absence of “a clearly expressed legislative intent to the contrary, that language must ordinarily be regarded as conclusive.” Consumer Products Safety Comm’n v. GTE Sylvania, Inc., 447 U.S. 102, 108 [100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980). Of course, there is no errorless test for identifying or recognizing “plain” or “unambiguous” language. Also, authoritative administrative constructions should be given the deference to which they are entitled, absurd results are to be avoided and internal inconsistencies in the statute must be dealt with. Trans Alaska Pipeline Rate Cases, 436 U.S. 631, 643 [98 S.Ct. 2053, 2061, 56 L.Ed.2d 591 (1978); Commissioner v. Brown, 380 U.S. 563, 571 [85 S.Ct. 1162, 1166, 14 L.Ed.2d 75 (1965).
In this case, the statement of the difficulty in identifying “plain” or “unambiguous language” is particularly apropos. Whether or not words of a statute are clear is itself not always clear. Even if the “common” understanding of “within retail sales outlets” were physically within the walls of a store, as the Claims Court held, that does not make the subject phrase “plain” or “unambiguous.” The determination of what usage of particular words is common must be rejected as an “errorless test.”
Moreover, even where a statute is clear on a purely linguistic level, interpretation may be necessary if that interpretation does not do justice to the realities of the situation. As stated by the Supreme Court in Church of the Holy Trinity v. United States, 143 U.S. 457, 459, 12 S.Ct. 511, 512, 36 L.Ed. 226 (1892), it is a “familiar rule that a thing may be within the letter of the statute, but not within its spirit nor within the intention of its makers.” See also United States v. Riverside Bayview Homes, Inc., — U.S.-, 106 S.Ct. 455, 461, 88 L.Ed.2d 419 (1985) (argument that it is “unreasonable to classify ‘lands,’ wet or otherwise, as ‘waters’ ” is “simplistic.”)
Finally, the question in this case is not what interpretation this court would give to the statute were it the executive branch. The issue to be decided by this court is whether the statute is capable of more than one interpretation and whether the agency’s interpretation is reasonable.
With these premises in mind, we turn to the statutory analysis.
III.
The arbitration award represents an amount estimated to be in excess of $10 million which must be paid from DOD current funds for essential government services for the military and their families. The brief review of legislative history noted above indicates that the funds Congress anticipated would be used for the state agencies for the blind were funds which could be diverted at no cost to the government and no diminution in essential government services. In keeping with that expectation, Congress over a period of 11 years has failed to appropriate any moneys to make up for the loss of exchange funds which the Claims Court held Congress intended to be transferred to the blind.
No rational reason can be advanced to conclude that Congress intended military personnel and their families to support the blind by giving up essential services. Indeed, the whole rationale behind the Claims Court’s finding that it had jurisdiction over the claim here shows the special nature of the funds generated by the military exchange systems and differentiates such funds from those of private groups organized by civilian employees, such as employees’ unions, which were clearly intend *407 ed to be diverted to the blind.[9] As indicated, the funds of the latter-type of organizations were being used without any governmental control for whatever group activities their membership wished, such as flowers for the sick, birthday and wedding gifts, band uniforms, scholarships, furnishings for recreation rooms, and general social activities.[10] No funding by Congress can be provided for such activities. In contrast, the only services financed by the funds of the military exchanges are child care centers, libraries, youth activities, gymnasiums, arts and crafts facilities and similar essential support services, which are furnished around the world for military personnel and families. Such services are of a nature for which appropriated funds are also used, indeed, have been provided by yearly Congressional appropriation. The amount of exchange-generated funds is taken into account in determining the amount of the appropriation. Precisely because of this interrelationship, the Claims Court found it had jurisdiction over this claim under the precedent of United States v. General Electric Corp., 727 F.2d 1567, 1570 (Fed.Cir.1984) and cases cited therein. Texas State Commission for the Blind v. U.S., 6 Cl.Ct. at 737-38.
The Claims Court avoided what it called the “difficult question” which would be raised were additional appropriated funds necessary as a result of its judgment (28 U.S.C. § 2517, 31 U.S.C. § 1304) by characterizing the judgment which will result as “in the nature of a refund.” 6 Cl.Ct. at 737. Under this theory, the judgment is then payable by DOD from the account which was credited with the revenues collected by the exchanges, or from other appropriated funds used by DOD to fund its morale, welfare and recreational programs.
The concept that the judgment is a “refund” is not only a tortured theory, but also ignores the realities of the judgment. The judgment of the Claims Court would require an immediate cut in essential government services to satisfy the retroactive liability, as well as additional appropriations indefinitely into the future to provide essential government services which otherwise must be reduced. It is unlikely that such a major change in financing for, or in the amount of, military support services would have been undertaken by Congress without serious controversy. There was none. Moreover, if the bill were intended to have such an effect, it would have been taken up by appropriate finance and military affairs committees. It was not. Skirting these problems, the Senate Subcommittee on the Handicapped, which reported the bill, inserted a last-minute amendment exempting the military exchanges, and the Senate Report states unequivocally that the exchanges were wholly exempt. See S.Rep. No. 937, 93d Cong., 2nd Sess. 24 (1974). The House floor debate agreed with the Senate’s understanding of the scope of the exemption. See 120 Cong.Rec. 35,712 (1974).
The 1973 statement submitted on behalf of organizations for the blind, in support of enactment of the 1974 amendments, was limited to the funds of civilian employee groups:
*408 The mandatory assignment of vending machine revenue would provide substantial sums of new money for the achievement of the purpose of the Randolph-Sheppard Act without creating any hardships for federal employees. Likewise, the mandatory assignment of this revenue to achieve the purpose of the Randolph-Sheppard Act would place no burden upon the United States Treasury because the funds in question have not been collected by the government. [Emphasis added.]
* * * * * *
Over a period of several years, unions of federal employees have been increasingly successful in acquiring the possession and use of revenue from vending machines operated on federal property. This has been accomplished by the cooperation and acquiescence of the administrative branch of government through the recognition of de facto “employee welfare committees” and “employee welfare funds.”
Randolph-Sheppard Act for the Blind Amendments of1973: Hearings on S.2581 Before the Subcomm. on the Handicapped of the Senate Comm, on Labor and Public Welfare, 93d Cong., 1st Sess. 139 (1973) (statement of representatives of various organizations for the blind).
The funds of such employee groups were attractive targets for diversion. No similar motive existed for reaching the earnings of military exchanges. Diversion of that income to state agencies for the blind would make no economic sense. It would simply be robbing Peter to pay Paul, and then appropriating money for Peter to make up for the transfer.
The government does not argue here that the Randolph-Sheppard Act does not apply to military bases. There is no question that Congress sought more opportunities for blind vendors on all DOD properties, and other provisions of the 1974 amendments effectively reach DOD.[11] These include expansion of blind opportunities from vending “stands” to vending “facilities,” e.g., cafeterias, including rooms with vending machines only; expansion of items to be sold; the granting of a mandatory “priority” in allocating sites rather than merely a “preference” to blind vendors; a requirement for sites for blind vendors in all new or renovated Federal buildings; and, of course, income sharing, which reaches the numerous non-military exchange groups within DOD. At this time, DOD is second only to GSA in implementing the program for the blind both in numbers of sites and in the amount of income turned over to the states for their programs.[12]
As initially drafted, that is, before the exemption, the bill amending the Act was so broad that it could be read to cover every vending machine on federal property. The circumstances surrounding insertion of the subsection providing exemptions were not conducive to precision in drafting.[13] The subsection simply appeared in a markup of the entire bill put before the January 29, 1974, executive meeting of the Senate Committee on Labor and Public Welfare, Subcommittee on the Handicapped.[14] There was no opportunity for input from other committees or from DOD. The minutes of the meeting, which are in the *409 record, disclose that the sole topic of discussion was the continuing controversy with the Postal workers and other unions over diverting funds from their vending machines and what compromise (such as grandfathering) could be worked out to mollify them.
On June 5, 1974, at another executive session, Senator Williams asked the sponsor of the bill, Senator Randolph, to explain it. Senator Randolph said the bill would enable more blind persons to become active so that they would not have to rely on relief or charity. “The moneys that should go to the blind are going to Federal employee unions.” He hoped that “an accommodation would be reached with the unions.” [15] Senator Dominick asked again “To whom does the income from vending machines now go?” Mr. Robert Hum-phreys (of the staff) replied, “To the Employee Union Welfare Committees.” Since Senator Randolph was the sponsor of the amendments, his explanation and that of the staff cannot be viewed as casual, off-the-cuff comments. The subcommittee was conscientiously restricting itself to reaching only funds of civilian organizations which were being withheld from the Treasury. The compromise worked out with the unions was that the blind would share in the vending machine income earned by private employee groups in exchange for Congress’ sanctioning the retention of the balance by such private groups. There was no similar compromise necessary with respect to exchange funds inasmuch as the retention of exchange funds had for years been approved and the exchanges were recognized as official government instrumentalities.[16]
On June 17, 1974, the Senate Committee on Labor and Public Welfare issued Senate Report 93-937, which is the principal Congressional report on the 1974 amendments. The Senate Report interprets the exemption to apply to all exchange operated machines:
Subsection (d) exempts certain activities from vending machine income assignment. Both military exchange systems and the Veterans Canteen Service operate under specific statutory authority, and are thus, as a matter of policy, excluded.
S.Rep. No. 937, supra, at 24.
A House version of the bill had been passed as part of H.R. 14225 on May 21, 1974; the Senate version on September 10, 1974. In presenting the conference version to the House for final passage, Mr. Brade-mas, floor manager of the bill and Chairman of the House Select Education Subcommittee, gave the following explanation of the military exchange exemption:
Other provisions of the conference report, Mr. Speaker, address the question of the assignment of vending machine income.
Briefly, this is what the bill would do: First. One hundred percent of income from machines in direct competition with a vendor, and 50 percent of income from machines not in direct competition shall *410 accrue to blind vendors and their state licensing agencies:
Second. At facilities where at least 50 percent of the hours worked are outside normal working hours, 30 percent of income from vending machines shall accrue to the vendors; and
Third. Facilities with less than $3,000 annual vending machine income are totally exempt, as are retail military sales outlets and the Veterans Canteen Service.
Mr. Speaker, the conferees are confident that these provisions will help blind vendors and adequately protect the rights of the Government and its employees with respect to the availability at all times of vending facilities and the assignment of income.
Finally, Mr. Speaker, I would like to congratulate my friend in the other body, Senator Randolph, for his persistence in this matter.
Mr. Sikes, Chairman of the House Armed Services Committee, sought explicit confirmation of the extent of that exemption and the following exchange occurred between them:[17]
Mr. SIKES. I would like the distinguished subcommittee chairman to verify for the record, that this provision exempts from the revenue-sharing plan all those vending machines which are operated by the military post exchanges, Navy exchanges, officer and enlisted messes, and so forth.
As you are aware, the profits from those vending machines are utilized by the services to finance such worthwhile endeavors as the base libraries, the youth activities, the gymnasium, and other sports activities, hobby shops and motion picture programs, ashore and afloat. The servicemen finance these programs themselves through the revenues collected in the retail sales outlet systems as I have mentioned. To require that these revenues be shared might well necessitate the appropriation of additional funds for the defense budget. Since work in the fiscal year 1975 defense appropriations bill has been completed, the effect would be to cut off these needed programs without support.

Would the gentleman confirm for me the fact that it is the intent that this paragraph shall not apply to the military services, and that this is in keeping with the language on page 24 of the Senate report [S.Rept. No. 93-937] which is more specific on this issue that [sic] is the conference report?

Mr. BRADEMAS. Mr. Speaker, I thank the gentleman from Florida for his fine remarks about this legislation. I am pleased to tell the gentleman that the answer to both his questions is “Yes.” [Emphasis added.]
120 Cong.Rec. 35,712 (Oct. 16, 1974).
Immediately following that exchange, the House passed the bill. It could not be clearer that Congress did not intend to cut back on funds for the military or to make additional appropriations as a result of 1974 Randolph-Sheppard amendments. The exemption for the exchanges was intended by both the Senate and the House to be complete. The Claims Court opined that the colloquy’s:
significance is further diminished by the fact that it occurred on the House floor several weeks after the Senate passed the legislation and several days after the Senate unanimously agreed to the Con *411 ference Report. Clearly, one cannot say that the Senators who voted for the language in issue did so with any understanding of the meaning reflected in this subsequent colloquy.
6 Cl.Ct. at 741 (citations omitted). The Claims Court’s analysis discounts the Senate’s own legislative history. The House was adopting the Senate’s understanding not vice versa. In any event, because of a presidential veto, Congress passed the bill again.[18] Mr. Brademas’s explanation, confirmed by the colloquy, thus, is a major factor in determining the intent of both houses, as Mr. Brademas was not simply “another member” but the floor manager and chairman of the sponsoring committee whose remarks are entitled to particular weight. See Lindahl v. Office of Personnel Management, 470 U.S. 768, 105 S.Ct. 1620, 84 L.Ed.2d 674 (1985).[19]
All legislative history expressly addressing the possible diversion of income from the exchanges indicates that income was to be exempt. The records contain not even a suggestion of cutting funds for essential military services or making up the loss with additional appropriations. The exchanges simply were not to be affected, as the blind organizations themselves represented. The portions of the congressional report, relied on by the Claims Court (and accepted by the dissent) as support for its view, do not, in fact, indicate a contrary purpose. Rather, the portions were deemed supportive to its theory that “within retail sales outlets” must be given a spatial connotation, as a matter of linguistics. Further, Congressional approval of the “model” Marine Corps base was made with reference to providing additional sites for blind vendors, not with reference to income-sharing. The Marine Corps base was not then sharing income generated by exchanges and never has.

HEW’s Interpretation of the Exemption

HEW had responsibility for coordinating the administration of the Act among the government agencies and was to draft regulations in consultation with them. There was substantial dispute between HEW and DOD as to the extent of the exemption provided for the military. None of the dispute, however, initially concerned the exemption of military exchanges. HEW agreed these organizations were exempt. Principally the dispute was over an exemption for enlisted and officers’ messes (not part of the exchanges). DOD pressed for such an exemption on the basis of the legislative history despite the absence of any language in the statute directed to the messes.
HEW vacillated on allowing this exemption. The negotiations between HEW and DOD and the series of proposed HEW draft regulations, as well as correspondence discussed below, confirm that the HEW position that military exchange income was to be diverted to the blind was a change from its original interpretation.
That the scope of the military exemption was not “plain” to HEW from the statutory language is evidenced by the various drafts of regulations which HEW considered over a period of two years. One of the first HEW drafts, dated March 20, 1975, read:
[T]he provisions of this section shall not apply to income from vending machines *412 under the control of post exchange or ships’ stores systems authorized under Title 10, United States Code, or to Department of Defense morale, welfare, and recreation activities or to Department of Defense clubs, messes, civilian restaurant and welfare funds____ [Emphasis added.]
This version continued through several drafts. An HEW memorandum dated June 2, 1975, clarified HEW’s position with respect to DOD civilian employee funds:
However, the latest revision of the proposed regulation proposed by the Department of Health, Education and Welfare (HEW) contains an exemption for these activities in recognition of legislative history (referring to discussions between Mr. Brademas and Mr. Sikes on October 18, 1974). While it is realized that this exemption could be interpreted to include both military and civilian morale, welfare, and recreation activities, HEW officials drafting the implementing regulation stated that such exclusion is not intended to provide relief for civilian nonappropriated fund activities____
The latest revision of the proposed regulation is being circulated within HEW with its expected publication in the Federal Register in about 60 days. [Emphasis added.]
The proposed regulation was not, however, published and the next version in July, 1975, while continuing the exemption for the exchanges, eliminated the exemption for officer and enlisted messes and civilian groups. This version read:
The provisions of this section shall not apply to income from vending machines under the control of post exchange or ships’ stores systems authorized under Title 10 of the United States Code____
DOD pressed for revision to exclude all vending machines in military base communities. The first suggestion by HEW that the exchange income was not exempt appears to have been made in October, 1975. DOD was continuing at that time to argue that messes and civilian DOD groups on military bases should be excluded. On December 23, 1975, HEW published proposed regulations simply repeating the statutory language with no interpretation of what the language meant. 40 Fed.Reg. 59,408, 59,414 (1975). DOD and HEW continued their negotiations.
On April 26, 1976, Congressman Sikes wrote Secretary Matthews of HEW, confirming that the intent of Congress was to exempt the military exchanges, stating: “Although the law was designed to expand opportunities for blind persons, it was not intended to cripple certain Armed Forces morale and welfare activities.”
At an April 28, 1976, meeting with DOD, HEW personnel proposed defining “vending machine” in the regulations to exclude any “machines from which the revenue accrues to the Federal Government for credit to the Federal Government.” HEW verified that the intent of this change was to exempt DOD non-appropriated fund instru-mentalities.[20]
DOD then wrote HEW as follows:
The revised wording of Section 1369.1(y) of the proposed regulations furnished to the attendees of the 28 April meeting and your Mr. Shay’s explanation that the revised wording is intended to accomplish the purpose of exempting vending machine income of Department of Defense (DOD) nonappropriat-ed fund instrumentalities (NAFIs) from the income-sharing provisions of the Amendments have, of course, greatly eased our concern. Assuming that the provisions of said Section 1369.1(y) are issued as revised, it would appear that the Congressional intent reflected in the 16 October 1974 exchange between Congressman Brademas and Congressman Sikes on the House floor will have *413 been appropriately incorporated in the HEW regulations. [Emphasis added.]
On May 11, 1976, Secretary Matthews answered Congressman Sikes’ letter, reassuring him that HEW appreciated his clarification of congressional intent with respect to officers and enlisted messes and that HEW was working closely with DOD. No mention was made of HEW’s intention to deny exemption to income from exchange vending machines.
In June, 1976, Congressman Brademas wrote Congressman Sikes:
[T]he problem with the Randolph-Sheppard Act proposed regulations which you recently brought to my attention ... appears to be solved.
The Department of Health, Education and Welfare has advised my subcommittee that the interpretation which we agreed upon in our colloquy on the House floor would be adhered to. Needless to say, I am glad that DHEW had decided to follow the intent of Congress in formulating its regulations. [Emphasis added.]
However, no regulations “conforming” to the intent of Congress were issued and HEW ceased consultation with DOD.
On March 23, 1977, HEW published final regulations which were exhaustive in other details but, with respect to the military exemption, did little more than repeat the statutory language. 42 Fed.Reg. 15,802-17 (1977), now 34 C.F.R. § 395.32 (1985).[21] Interestingly, the preamble to the regulations, in explaining why officers and enlisted messes were not considered exempt, states that the act “limits exemptions from the income sharing requirements to systems authorized under Title 10 of the United States Code____” (Emphasis added.) 42 Fed.Reg. at 15,807. To exclude messes would, HEW stated, require statutory clarification despite their “linkage to Title 10.” Id. On the other hand, HEW did exempt (without an explicit statutory basis) stamp vending machine, copy machines, pay telephones, coin-operated game machines, juke boxes and certain NASA and National Park Service concessions, 34 C.F.R. § 395.30 (1985), citing such reasons as “vending that is uniquely supportive of the Postal Service mission,” too “significant” a change, probable “Congressional intent,” and “not traditionally found in blind operated vending facilities.” 42 Fed.Reg. at 15,806.
On July 7, 1977, DOD published its own proposed regulations which stated flatly that income sharing did “not apply to: Income from vending machines operated by or for the military exchanges or ships’ stores systems.” 42 Fed.Reg. 34,895 (1977). The identical provision was included in DOD’s final regulations. 43 Fed.Reg. 25,337, 25,341 (June 12, 1978), now 32 C.F.R. § 260.3(i)(3)(i) (1985).
The agencies were then at logger-heads. DOD attempted to get clarifying amendments before Congress. As acknowledged in the majority decision of the arbitrators:
It should be noted, further, that DOD’s inability to convince Congress to pass an amendment making clear the broad nature of the exemption is not helpful in assessing Congressional intention since HEW and its successor, the Department of Education, has, through the Office of Management and Budget, effectively blocked this legislation from being considered by Congress.
In 1979, HEW proposed to DOD that the Department of Justice resolve the conflict between the agencies, stating:
Since the Department of Health, Education, and Welfare believes that only income generated within retail sales outlets is exempt, we believe that at this time, as suggested at the meeting held by the Office of Management and Budget, this issue of statutory construction is appropriate for referral to the Department of Justice for resolution.
However, it was not until the Oklahoma litigation that the matter was referred to the Department of Justice for resolution of the conflicting HEW/DOD interpretations. Justice upheld DOD. HEW acknowledges *414 that it is bound by Justice’s ruling and no longer advances its former unpublished interpretation.[22]
Under these circumstances, there is no basis for deference to the interpretation by HEW. Internally, HEW has vacillated. Its published regulations have never set forth an interpretation of the statutory language. Its late-adopted private interpretation was never published or given effect. It is bound by Justice’s interpretation. And, finally, in the face of Justice’s interpretation, which conflicted with HEW’s, HEW has found it unnecessary to revise its regulations. This is understandable since HEW’s regulations have never done more than repeat the statute.

The Statutory Purpose

The Claims Court looked to the overall purpose of the legislation and concluded that an exemption for the exchanges would leave “little or no opportunity” for blind vendors on DOD installations since the majority of vending machines were operated by the- exchanges. That finding is clearly erroneous in view of DOD’s large contributions to state agencies for the blind.
In any event, the statutory purpose to be considered here is not simply the purpose of the legislation, but the purpose of the exemption. That exemption was designed to keep the financial support of essential services by the exchanges intact so that Congress need not appropriate additional funds. Congress expected the exchange income to continue to supplement essential programs approved by Congress. Senator Randolph, the blind groups, Mr. Brademas, Mr. Sikes, and both chambers of Congress all agreed on this purpose.

TV.

The Statutory Language

Given the congressional purpose of the exemption, the question becomes whether the language can reasonably be interpreted, as in DOD’s regulation, to effectuate that purpose. We conclude that the statutory language has sufficient ambiguity to make DOD’s interpretation reasonable.[23]
The first phrase which must be looked at is “income from vending machines.” “Vending machine income” requires interpretation, as reflected by the definitions of these terms in HEW regulations setting out exclusions for vending machines of various types and at certain of the National Park Service and NASA facilities. 34 C.F.R. § 395.30 (1985). No statutory provision authorizes these exemptions. HEW simply deemed it necessary and within its power to exclude certain categories of vending machine income which came within the literal words of the statute but were not, in HEW’s view, within its intended scope.
“Within retail sales outlets” is not without some ambiguity. “Within” can mean “a part of” a system as well as “inside” a structure. “Retail sales outlets” need not mean “stores.” The military exchanges operate movie theatres and other recreation facilities, which easily fall within the term “retail sales outlets” and are not “stores.” Indeed, an area with only vending machines has become a typical “retail sales outlet.”
TSCB argues that the phrase “within retail sales outlets”, is surplusage if DOD’s interpretation is accepted.[24] By the same token, the words “under the control” are surplusage under the contrary interpretation. No real significance can be attached to either argument.
*415 TSCB also argues that Congress narrowly drafted the exchange exemptions in comparison with the Veterans Canteen Service exemption. However, the Canteen Service does not have retail outlets which generate a surplus to be used for other services. It simply provides articles and services in veterans hospitals and any surplus income is required by statute to be turned in to the Treasury. 38 U.S.C. § 4201. Thus, this difference in exemption language can be explained. In any event, both the Senate and the House said that both were intended to be wholly exempt.
This parsing of sentences is a meaningless exercise here. Undoubtedly, in some instances where statutory language has been finely tuned to cover or to exclude, it is important to consider each word and its relationship to others with great care. This statutory provision was not drawn with great care or precision. For example, the reference to the exchanges systems being authorized by Title 10 is erroneous. See supra note 16.
We do not have an instance here where the words of an exemption were selected after debate over its scope. Indeed, in light of the legislative history, had no exemption been specifically granted, an interpretation by regulation to exclude the military exchanges from the definition of “vending machine income”—which HEW has concluded is proper for other agencies—would appear appropriate. The language selected to insure that the military exchanges were unquestionably exempt “represents an instance of inartful drafting rather than the intentional drawing of a subtle distinction.” Exxon Corp. v. Hunt, — U.S. -, 106 S.Ct. 1103, 1113, 89 L.Ed.2d 364 (1986).
V.
“An agency’s construction of a statute it is charged with enforcing is entitled to deference if it is reasonable and not in conflict with the expressed intent of Congress.” United States v. Riverside Bay-view Homes, Inc., 106 S.Ct. at 461. After considering the ambiguities in the statutory language, the legislative history supporting DOD’s position, the purpose of the exemption, and the status of the military exchanges as non-appropriated fund instru-mentalities performing essential government services, we are convinced that DOD’s regulation is reasonable and is not in conflict with the intent of Congress as expressed in the statute. For the foregoing reasons, we agree with the 10th Circuit that DOD’s regulation is not void. The judgment of the Claims Court is reversed.[25]
REVERSED.

. 6 Cl.Ct. 730 (1984).

. Comp.Gen.Dec. B-l 12,840, 32 Comp.Gen. 282 (Dec. 10, 1952). The proposed legislation was never passed.

. Oklahoma had filed an arbitration complaint more than a year before. The district court did not require exhaustion of administrative remedies because of the delay and the government's interposing of no objection. Oklahoma v. Weinberger, 582 F.Supp. 293, 294 n. 2 (W.D.Okla.1982).

. We note that the Tenth Circuit, in affirming summary judgment, specifically quoted the district court’s finding that the language was "ambiguous.” 741 F.2d at 292.

. That the Claims Court was incorrect on this point is analyzed infra.

. The court quoted from the Senate Report, S.Rep. No. 937, 93rd Cong., 2d Sess 21 (1974), "Subsection (d) provides that the assignment of income provisions of subsections (a) and (b)(1) do not apply to vending machine income from military exchange retail outlets" and a similar passage, S.Rep. No. 937 at 30.

. Faced with the 10th Circuit decision, TSCB sought to prevent the government from raising any legal question attacking the merits of the award. TSCB contended that the Claims Court lacked "jurisdiction" to consider such a defense for two reasons: (1) the Act provides for a right to appeal from an arbitration award only specifically in favor of the claimant, and (2) alternatively, the government’s challenge should be considered barred by a statute of limitations.
We need not decide whether the U.S. could have taken an appeal from the award. The issue is whether the presence of a specific provision in the Act allowing appeal by the claimant bars the U.S., by implication, from defending against enforcement of the award on the ground that the award is not authorized by statute. As a matter of statutory interpretation, we hold that it does not. With respect to the assertion of a bar based on a statute of limitations, none is applicable here against the United States. United States v. Summerlin, 310 U.S. 414, 416, 60 S.Ct. 1019, 1020, 84 L.Ed. 1283 (1940) (United States is not bound by state statutes of limitations); Guaranty Trust Co. v. United States, 304 U.S. 126, 58 S.Ct. 785, 82 L.Ed. 1224 (1938) (United States is not bound by federal statutes of limitations unless their terms specifically so provide). Finally, TSCB makes no argument that the government is improperly making a collateral attack on the arbitration award. In this connection, we note that the parties agreed before the arbitration panel that "the meaning of the exemption will be finally resolved by the courts.” Accordingly, we hold that the Claims Court properly considered the issue of the legality of the award under the statute.

. Some of the legislative history is confusing in that such private organizations of government employees are referred to as "non-appropriated fund instrumentalities" (NAFI). That term has had no single meaning among government agencies. See Study of Procurement Payable From Nonappropriated Funds, August 1976. Cf. L’Enfant Plaza Properties, Inc. v. U.S., 668 F.2d 1211, 229 Ct.Cl. 278 (1982). See also infra note 18.

. Review of Vending Operations On Federally Controlled Property, Report to the Subcomm. on the Handicapped, Senate Comm, on Labor and Public Welfare, B-176886 37,'43 (Sept. 27, 1973) (hereinafter “GAO Report"). In addition to civilian employee groups, GAO noted competition from minority-owned businesses'which were being favored over blind vendors and privately contracted cafeterias in connection with which vending machines were allowed in order to lower prices in the cafeterias. Id. at 42; see also Letter from General Services Administration to Senator Randolph (Dec. 27, 1973). However, the legislative history makes clear that the activities of civilian employee groups were the primary concern of Congress.

. The GAO report as summarized in 6 Cl.Ct. at 732-33 was concerned with the number of blind vendors on DOD facilities, including bases, not with diverting exchange income.

. The record shows DOD contributed $784,613 to state blind agencies in 1983; $729,471 in 1981. The dissent errs in its assertion that DOD can somehow keep blind vendors off military bases because of the subject exemption. The exemption has no applicability to the mandatory requirement to provide sites for blind vendors.

. See infra note 16 and section IV.

. The exemption may have been in response to a brief comment by Lieutenant General Benade of DOD during a 1973 hearing, but contrary to the dissent, there is no evidence of a "compromise” with respect to the military exchanges. Even TSCB does not so assert. All evidence is that the exchanges were to be entirely exempt.

. The percentages and the §3,000 exemption became the accommodation finally adopted for these groups.

. Technically the exchanges and ships’ stores systems are not "authorized by title 10” as stated in the statute, but are established by the Secretary of Defense under general authority to regulate the department. Although there were earlier federal court cases dealing with the exchange activities and their employees, the most significant decision is Standard Oil Company of California v. Johnson, 316 U.S. 481, 485, 62 S.Ct. 1168, 1170, 86 L.Ed. 1611 (1942), in which the Supreme Court stated, “[W]e conclude that post exchanges, as now operated, are arms of the government deemed by it essential for the performance of government functions. They are integral parts of the War Department, share in fulfilling the duties entrusted to it, and partake of whatever immunities it may have under the constitution and federal statutes." The court further stated, "[t]hat the establishment and control of post exchanges have been in accordance with regulations rather than specific statutory directions does not alter their status, for authorized War Department regulations have the force of law.” 316 U.S. at 484, 62 S.Ct. at 1169.
This misstatement in the statute is symptomatic of its inherent flaws which must be overlooked to carry out congressional intent.

. The dissent's comments on lack of a quorum are entertaining but legally in error. A quorum was established by a count of the members prior to debate on the conference report. Under House procedures a quorum is deemed present at all times until it is determined by a count of the House on a proper point of order that no quorum is present. Further, a member may make the point of order that no quorum is present whether there is, in fact, a quorum present or not. See VI C. Cannon, Cannon’s Precedents of the House of Representatives, 805, 853 (1935). However, the question of a quorum cannot be raised once established by vote until “the Speaker has put the pending motion or proposition to a vote." H.Rep. Rule XV 6(e)(1); see abo W. Oleszek, Congressional Procedures and the Policy Process, 125-26 (2d ed. 1984). Thus, during the debate, a quorum was legally present under House rules and the number of members present may, in fact, have constituted a quorum.

. Following initial passage, President Ford vetoed the bill, the veto was overridden. However, the President returned the bill to Congress claiming that the veto was a pocket veto (which could not be overriden) and not a return veto. Congress’ override was based on the assumption that the veto was a return veto. To eliminate uncertainty, both the House and Senate again passed a bill with the identical military exchange exemption, S.4194, on November 26, 1974. See S.Rep. No. 1297, 93d Cong., 2d Sess 1-2, reprinted in 1974 U.S.Code Cong. & Ad. News 6373-74; See abo Kennedy v. Jones, 412 F.Supp. 353 (D.D.C.1976). Thus, contrary to the Claims Court, the Senate passed the exemption after the colloquy in the House.

. The dissent errs in discounting Mr. Brade-mas’ statements and the Brademas-Sikes colloquy. As in Lindahl, these were not unreliable comments "just by ‘a few congressmen,’ but by the sponsor of the legislation [and chairman of the] Subcommittee from which it originated.” 105 S.Ct. at 1631.

. Unlike other agencies, DOD used this term only for organizations performing approved government services—not civilian employee groups. Under this regulation, it is understood the messes would have been exempt. The question of an implied exemption for messes is not before us.

. The regulations added the words "operated" before "within" and "post” before exchanges.

. The Claims Court erroneously believed that HEW’s interpretation was entitled to more weight than DOD’s. While HEW was the coordinator of the program throughout the government, it was only on a par with DOD in an interagency legal dispute before Justice. See Exec. Order No. 12,146, 3 C.F.R. § 409.411 (1980).

. Judge Davis, in his concurrence, more eloquently expresses the interrelationship of the strength of the language, on the one hand, and the strength of legislative history, on the other.

. Although not very compelling, DOD’s explanation, that the exchanges occasionally make sales which are "wholesale” in nature, at least gives some reason for including the phrase.

. The dissent, despite its length, has only one argument: the statutory language is unambiguous. If the slightest ambiguity were to be acknowledged by the dissent, its position crumbles away. In stark contrast, HEW, DOD, Justice, the three arbitrators, the Oklahoma district court and the judges of the Tenth Circuit all found the language subject to various interpretations. If the dissent did not distort the Tenth Circuit opinion on this point, the dissent would have no basis for characterizing our sister circuit’s reasoning as "weak.”