908 F.2d 967
Unpublished Disposition
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
Donald J. MORRIS, Margaret A. Brown, Joseph O. Byard,
Rebecca Garber Calder, Karen Carter, Lewis A. Carter, Dennis
Duncan, Linda S. Edwards, William Eitington, George Leo
Fear, Dwaine N. Garber, Donald E. Glover, Johnnie James,
Clara Leatherbury, Glenn Libertino, Raymond Lowder,
Millicent A. Morris, Pete Reppert, G.R. Rogers, Parley Van
Sickle, Lisa M. Thomas, Individually and on behalf of all
persons similarly situated, Plaintiffs-Appellants,
v.
STATE OF MARYLAND, Maryland State Department of Education
Division of Vocational Rehabilitation, David W. Hornbeck, in
his capacity as Superintendent Maryland Department of
Education, Richard A. Batterton, in his capacity as
Assistant Deputy Superintendent, Bureau of Vocational
Rehabilitation and Correctional Education Maryland
Department of Education, Defendants-Appellees.
 No. 89-1013.
 United States Court of Appeals, Fourth Circuit.
 Argued Nov. 1, 1989.
Decided July 11, 1990.
 
 Appeal from the United States District Court for the District of Maryland, at Baltimore. Paul V. Niemeyer, District Judge. (CA-88-83-PN)
 Daniel F. Goldstein, Brown & Goldstein, Baltimore, Md., (argued), for appellants. Andrew D. Freeman, Brown & Goldstein, Baltimore, Md., on brief.
 Caroline Elizabeth Emerson, Assistant Attorney General, Baltimore, Md., (argued), for appellees. J. Joseph Curran, Jr., Attorney General, Laura Burton-Graham, Assistant Attorney General, Baltimore, Md., on brief.
 D.Md.
 AFFIRMED.
 Before MURNAGHAN and WILKINS, Circuit Judges, and Alexander HARVEY, II, Chief United States District Judge for the District of Maryland, Sitting by Designation.
 PER CURIAM:
 
 
 1
 Twenty-one blind vendors have appealed the district court's dismissal of the suit they filed against the State of Maryland and two state officials. The vendors had brought the suit under the Randolph-Sheppard Act, the federal statute that promotes the operation of vending facilities by blind persons, alleging, among other things, that the State's collection of set-aside charges violated the statute. The suit was dismissed on grounds that the vendors had failed to exhaust their administrative remedies.
 
 
 2
 In 1936, Congress passed the Randolph-Sheppard Act, 49 Stat. 1559 (codified as amended at 20 U.S.C. Secs. 107 to 107f (1982)) (the Act), to promote the employment of blind persons by providing for their operation of vending facilities at federal installations. 20 U.S.C. Sec. 107. Since its enactment, the program generally has been administered by the states. A state agency seeking to be duly authorized to administer the program is required to apply to the United States Secretary of Education (the "Secretary"). Id. Sec. 107b. Due to a 1954 amendment, 68 Stat. 664, an applying agency must agree to provide a fair hearing and not to charge an unreasonable set-aside.[1] Id.
 
 
 3
 In 1958, the Maryland Department of Education's Division of Vocational Rehabilitation (DVR) was designated as the State's licensing agency. The State also announced hearing procedures that were eventually codified into the Maryland regulations. Md.Admin.Code., tit. 13A, Sec. 05.02.02D (1987).
 
 
 4
 In 1974, Congress again amended the Randolph-Sheppard Act. Pub.L. No. 93-651, 89 Stat. 2. A significant change was that instead of agreeing to provide a simple hearing procedure when applying to be approved as the designated state agency, a state agency must agree to provide a more detailed hearing procedure--a two-tiered process that includes both a hearing and an arbitration proceeding. 20 U.S.C. Sec. 107b(6).
 
 
 5
 In October 1987, certain blind vendors, participating in the Randolph-Sheppard program administered by Maryland, refused to pay the set-aside being charged by Maryland. The vendors contended that the State had failed to obtain the required approval of the United States for either its regulations or the amount of set-aside that the State collected. The vendors also contended that the State had breached an agreement it had previously made with the vendors that no more set-aside would be assessed once the vendors assumed certain costs. In December 1987, Richard Batterton, the Assistant Deputy Superintendent of the Maryland Department of Education's Bureau of Vocational Rehabilitation and Correctional Education, sent letters threatening to terminate the vendors' licenses if they did not pay the charges. Appended to the letter was a copy of proposed administrative hearing procedures in accordance with the 1974 amendments to the Randolph-Sheppard Act.
 
 
 6
 On January 13, 1988, the vendors instituted suit in the United States District Court for the District of Maryland against the State, DVR, David Hornbeck, as the Superintendent of Maryland's Department of Education, and Richard Batterton. The vendors claimed that the DVR had exacted set-asides in contravention of the Randolph-Sheppard Act and their fourteenth amendment rights, and had also failed to train them in violation of the Act. They sought a declaratory judgment, preliminary and final injunctive relief, and damages for money wrongfully collected.
 
 
 7
 On January 29, 1988, Maryland published in the Maryland Register proposed regulations for the program, including proposed hearing procedures virtually identical to the copy of the proposed procedures that was sent to the vendors. On April 18, 1988, the parties stipulated that the vendors would pay the set-aside amounts when the United States Department of Education approved them and that no vendor would be sanctioned for withholding set-asides prior to the date of such approval. On April 22, 1988, Maryland published a Notice of Final Action, announcing that the regulations would become effective on May 2, 1988. On May 3, 1988, pursuant to the Randolph-Sheppard Act, the United States Secretary of Education approved Maryland's regulations.
 
 
 8
 On December 9, 1988, Judge Niemeyer, for the district court, granted the defendants' motion to dismiss on grounds that the vendors had failed to exhaust their administrative remedies. On appeal, the vendors maintain that the district court erred because: (1) the Randolph-Sheppard Act does not require exhaustion; and, even if it does, (2) no adequate administrative procedure existed when they filed suit; (3) an administrative proceeding would have been futile; and (4) an administrative proceeding would have caused irreparable injury.
 
 
 9
 We conclude that the district court did not err in requiring the vendors to exhaust their administrative remedies before seeking review in federal court. The Randolph-Sheppard Act provides a detailed administrative grievance procedure. The most reasonable inference drawn from its existence is that Congress did not intend for the procedure to be circumvented by the filing of actions in federal courts. The fact that Maryland's procedures were pending formal approval is of little consequence when considering the purposes behind the exhaustion doctrine; waiving the exhaustion requirement would exalt concern for form over the substantive policies advanced by the doctrine.
 
 
 10
 I. Does the Act Require Exhaustion?
 
 
 11
 The Randolph-Sheppard Act provides as follows:
 
 
 12
 Any blind licensee who is dissatisfied with any action arising from the operation or administration of the vending facility program may submit to a State licensing agency a request for a full evidentiary hearing, which shall be provided by such agency in accordance with section 107b(6) of this title. If such blind licensee is dissatisfied with any action taken or decision rendered as a result of such hearing, he may file a complaint with the Secretary who shall convene a panel to arbitrate the dispute pursuant to section 107d-2 of this title, and the decision of such panel shall be final and binding on the parties except as otherwise provided in this chapter.
 
 
 13
 20 U.S.C. Sec. 107d-1(a) (emphasis added). Section 107d-2 provides that the arbitration panel's decision "shall be subject to appeal and review as a final agency action." 20 U.S.C. Sec. 107d-2(a).
 
 
 14
 The vendors maintain that the Randolph-Sheppard Act does not require the exhaustion of administrative remedies prior to filing suit. They contend that the use of the word "may" rather than the word "shall" evinces congressional intent to make the administrative hearing optional. The State, of course, contends that the administrative procedure is mandatory prior to filing suit in federal court.
 
 
 15
 Both parties cite cases that have been decided by other courts in support of their positions. The State offers Randolph-Sheppard Vendors of Am. v. Weinberger, 795 F.2d 90, 104 (D.C.Cir.1986); Fillinger v. Cleveland Soc'y for the Blind, 587 F.2d 336, 338 (6th Cir.1978); Massachusetts Elected Comm. of Blind Vendors v. Matava, 482 F.Supp. 1186, 1189 (D.Mass.1980); and New York v. United States Postal Serv., 690 F.Supp. 1346, 1351 (S.D.N.Y.1988), as decisions holding that exhaustion under the Act is mandatory. On the other hand, the vendors point to Texas State Comm'n for the Blind v. United States, 6 Cl.Ct. 730, 735 n. 12 (1984), rev'd on other grounds, 796 F.2d 400 (Fed.Cir.1986), cert. denied, 479 U.S. 1030 (1987); and Oklahoma v. Weinberger, 582 F.Supp. 293, 294 n. 2 (W.D.Okla.1982), aff'd, 741 F.2d 290 (10th Cir.1983), as instances where courts have decided that the administrative procedures under the Act are only discretionary.
 
 
 16
 The D.C. Circuit's approach makes the most sense. Rather than hinge the determination solely on the use of the word "may," in Randolph-Sheppard Vendors, the D.C. Circuit took a "holistic" approach by analyzing the statute as a whole. Because (1) the Randolph-Sheppard Act establishes a clear and explicit administrative scheme for the resolution of disputes arising under the Act, and (2) the procedural scheme parallels the pattern of authority under the statute, an inference should be drawn that Congress intended the mechanism to be mandatory. 795 F.2d at 101-03. Furthermore, because the Act states that the arbitration panel's decision shall be subject to appeal and review as a final agency action, in which case such review is limited and not de novo, 5 U.S.C. Sec. 706 (1982), the D.C. Circuit held that Congress should not be deemed also to have provided for initial de novo review in the federal courts. 795 F.2d at 102-03. The D.C. Circuit's reasoning is much more persuasive than the mere inference that the word "may" means that the procedure is optional.
 
 
 17
 Indeed, inserting the word "shall" into the statute, if that were necessary to signal an exhaustion requirement, would be quite awkward, since it would then state that aggrieved vendors must arbitrate disputes, even if they did not intend to litigate at all. Accepting the vendors' statutory argument would also imply that, if a vendor does submit to a state hearing and does not like the result, instead of filing a complaint with the Secretary to arbitrate the matter, he or she could take the matter to the federal courts, since the second sentence of the relevant section states that if a vendor is dissatisfied with the hearing, "he may file a complaint with the Secretary." 20 U.S.C. Sec. 107d-1(a). Obviously, "may" should not be read as creating the alternative of a federal court suit in either situation or a vendor could go in and out of the administrative procedure as he or she wished.
 
 
 18
 A reading of the statute demonstrates that the Randolph-Sheppard Act mandates the exhaustion of the administrative remedies prior to instituting an action in the federal courts. See Fillinger, 587 F.2d at 338 (congressional policy is that federal courts are not tribunals of first resort for grievances under the Randolph-Sheppard Act).
 
 
 19
 II. Was An Adequate Procedure In Place?
 
 
 20
 The vendors further contend that, even if exhaustion is required under the Act, no valid state procedure existed at the time when the suit was filed. They claim that the existing administrative remedies, promulgated in 1958, did not meet the more detailed statutory standard. They also argue that the procedures adopted shortly after the suit was filed are irrelevant because the vendors should only be required to exhaust the valid remedies that existed at the time their suit was filed.
 
 A. Existing Procedures
 
 21
 The State points out that since 1958 the DVR has offered some sort of hearing and that this procedure existed at the time the vendors filed suit. However, if the State means that the vendors should have used the existing procedure, such an argument is seriously misguided.
 
 
 22
 The determination that the vendors are required to exhaust their remedies under the Randolph-Sheppard Act results from a reading of that Act and an interpretation of congressional intent. Because Congress prescribed an elaborate remedial mechanism for the resolution of disputes arising under the Act, it is entirely appropriate to conclude that Congress must have intended that such a remedy be exhausted. However, it would be entirely inappropriate to conclude that, in the absence of the statutorily prescribed mechanism, Congress alternatively intended that a substitute mechanism offered by the State not mentioned in the statute also be exhausted.
 
 B. Newly Adopted Procedures
 
 23
 In December 1987, Batterton attached a copy of the proposed procedures to the letter he sent to the vendors and stated that each licensee was entitled to a full evidentiary hearing and arbitration in accordance with the Act. The proposed regulations were in accordance with the Act's requirements and had already been approved by the Maryland State Board of Education for publication in the Maryland Register. The Committee of Blind Vendors, a representative group, was involved in the development of these new regulations. The State asserts, and the vendors do not dispute, that the vendors were well aware not only of the new procedures but also that the procedures were approved for publication.
 
 
 24
 The State argues that the proposed administrative procedures were adequate because they were actually made available to the vendors prior to their filing of their suit, with notice that they were soon to be formally adopted, and they were formally adopted shortly after the suit was filed. The vendors argue that the adequacy of the remedy should be measured at the time when the suit was filed; and at the time the vendors filed suit the procedures had not been formally adopted by the State or approved by the Secretary. Hence, they contend, exhaustion of administrative remedies should not have been required when the existing remedies were inadequate.
 
 
 25
 But this is not a case where the vendors, at the time they filed suit, were unaware of the impending formal approval of the proffered procedures. Neither is this a case where the technical inadequacy of the remedial procedures persisted throughout the pendency of the suit. In either situation, the vendors would present a more compelling argument.
 
 
 26
 The procedures that were offered to the vendors prior to their institution of suit were substantively adequate yet formally inadequate, and the vendors knew, when they instituted suit, about the impending formal adequacy of the procedures. Because the change making exhaustion a prerequisite occurred so soon, with advance notice to the vendors, requiring exhaustion leads to no undue prejudice. See Fillinger, 587 F.2d at 338. Furthermore, in such a situation, the policy concerns of the exhaustion doctrine are still advanced by requiring exhaustion.
 
 
 27
 Requiring litigants to exhaust their administrative remedies advances, at least, four policy concerns: (1) prevention of premature interruption of the administrative system required for the development of agency expertise and process; (2) preservation of agency autonomy in administering the scheme by providing an opportunity for the agency to correct its own errors; (3) promotion of effective judicial review with a more developed record; (4) promotion of judicial efficiency by avoiding an unnecessary decision. See Randolph-Sheppard Vendors, 795 F.2d at 104-05; K. Davis, 4 Administrative Law Treatise Sec. 26.1, at 415 (1983).
 
 
 28
 The fact that the procedures were not formally adopted does not undermine the promotion of those policies. Giving the DVR a chance to resolve the dispute provides an opportunity for it to correct any improper set-aside demand that might have occurred and to consider its regulatory scheme against the backdrop of federal requirements. Further, should the state agency or the Secretary's arbitration panel agree with the vendors, an unnecessary decision in the federal courts would be avoided.
 
 
 29
 The vendors do point to a valid policy concern that the law should not encourage agencies to delay the promulgation of required procedures until suits are actually filed. But that concern is not implicated in this case--the State here developed, announced, and made available the proposed procedures before the vendors instituted the suit.
 
 
 30
 III. Would The Administrative Remedy Have Been Futile?
 
 
 31
 The vendors further claim that any administrative proceedings would have been futile because they sought to prove that the set-asides collected by the State prior to federal approval were illegally exacted and that an agreement previously reached by the parties precluded the collection of those set-asides. Because they are seeking to nullify the State's prior action, the vendors argue that a hearing would be futile: when the defendants are the decision-makers, there can be no doubt as to the outcome.
 
 
 32
 However, such is the case in almost any suit challenging agency action. If the vendors' argument were accepted to relieve their requirement of exhaustion, the doctrine of requiring the exhaustion of administrative remedies would be eviscerated. See Randolph-Sheppard Vendors, 795 F.2d at 105 (for administrative remedy to be futile it must be "clearly useless," not just "unlikely"). The vendors have made no showing that the DVR will rule against their claims. Cf. Committee of Blind Vendors v. Dist. of Columbia, 695 F.Supp. 1234, 1239-40 (D.D.C.1988) (exhaustion futile when agency that holds hearing has no jurisdiction to decide case).
 
 
 33
 IV. Would The Administrative Remedy Have Caused Irreparable
 
 
 34
 Injury?
 
 
 35
 The vendors also argue that if they exhaust their administrative remedies, they would be required to pay set-aside in the interim, but upon a later victory, recovery of the charges would be precluded by the State's eleventh amendment immunity.
 
 
 36
 But the set-aside currently being collected has now been approved by the Secretary; thus, it seems unlikely that the amount is being collected in violation of the Act. The real issue in the merits of their case is whether the State properly collected set-aside prior to the Secretary's approval--any irreparable injury in that regard has already occurred.
 
 
 37
 It is also doubtful whether eleventh amendment immunity would be available to the State if the vendors do eventually file for a review of the administrative proceedings. See Delaware Dep't of Health & Soc. Svcs. v. Dep't of Educ., 772 F.2d 1123, 1136-37 (3d Cir.1985) (eleventh amendment does not bar recovery from state pursuant to Randolph-Sheppard because the Act requires the states to submit to arbitration, where damages are commonplace; hence, relationship is essentially contractual); Committee of Blind Vendors, 695 F.Supp. at 1240-41 (agreeing with the Third Circuit's analysis on the issue). We, therefore, do not consider it "likely" that the vendors will suffer irreparable injury as a result of the exhaustion requirement.
 
 
 38
 Accordingly, the judgment of the district court is
 
 
 39
 AFFIRMED.
 
 
 
 [1]
 "Set-aside" is the amount of a vendor's proceeds that is taken by the state to fund its administration of the program