NORFOLK DREDGING COMPANY, INC., Plaintiff,

v.

The UNITED STATES, Defendant,

and

Bean Stuyvesant, LLC, Defendant–Intervenor.

No. 03–2225C.

United States Court of Federal Claims.

Oct. 14, 2003.

Michael H. Payne, Ft. Washington, PA, for plaintiff. Joseph A. Hackenbracht, Starfield and Payne, Guilford D. Ware, Crenshaw Ware and Martin, Norfolk, VA, of counsel.

Domenique Kirchner, Washington, DC, with whom was Assistant Attorney General Peter D. Keisler, for defendant. James W. Stirling, U.S. Army Corps of Engineers, Wilmington, NC, of counsel.

Peter M. Kilcullen, Alexandria, VA, for intervenor. Jeffery F. Lawrence and Heather M. Spring, Sher and Blackwell, Washington, DC, of counsel.

### *ORDER*

MILLER, Judge.

This pre-/post-award bid protest action is before the court after argument on the parties' cross-motions for summary judgment. Plaintiff faults the Government for permitting intervenor dredging company, an entity owned by a foreign corporation in combination with a company 50% owned by U.S. citizens, to enlarge an exemption to U.S.-preference legislation that restricts dredging in U.S. waters to U.S.-built, 75% U.S.-citizen-owned vessels and vessels chartered by a

U.S. citizen or U.S. entities with no less than 75% U.S.-citizen control.

## FACTS

The relevant facts, which are largely undisputed, derive from the administrative record. On August 8, 2003, the U.S. Army Corps of Engineers (the "Corps") issued an Invitation for Bids on Solicitation No. DACW54–03–B–0011 for dredging of Morehead City Harbor, Beaufort Harbor, and Brandt Island, North Carolina. Four sealed bids were received and opened on September 16, 2003.

Bean Stuyvesant, LLC ("intervenor"), was the apparent low bidder at $9,570,800.00. Norfolk Dredging Company, Inc. ("plaintiff"), was the second lowest bidder at $9,577,560.00. On September 25, 2003, plaintiff filed this protest claiming that intervenor is unqualified to perform the contract. Due to environmental restrictions, the contract may not begin before November 1, 2003, but must be completed by April 30, 2004.[1] Timely award of the contract was crucial because the end of the Government's fiscal year was imminent. Pursuant to an agreement among the parties, the Corps awarded the contract to intervenor on September 30, 2003, despite the pendency of plaintiff's protest.[2] Thus, this protest, while technically filed pre-award, proceeded as a post-award matter.

Plaintiff complains that intervenor is not qualified to perform dredging in U.S. waters as prohibited by the Oceans Act of 1992. 46 U.S.C. app. § 292 (2000). The Oceans Act, a comprehensive Act that includes provisions precluding foreign citizens from engaging in dredging, was the most recent of laws dating from 1906 that implemented a policy of restricting foreign operations in coastwise trade, vessels plying between U.S. ports. Congress has restricted coastal trade to vessels that are built and documented[3] in the United States, 46 U.S.C. app. § 883 (passed in 1920), and at least 75% U.S.-citizen owned, 46 U.S.C. app. § 802 (passed in 1916). Dredging, specifically, has been limited by the Foreign Dredge Act of 1906, 46 U.S.C. app. § 292, which bars foreign-built dredges from operating in U.S. waters.

To complete the subject contract, intervenor submitted that it will use the dredge MERIDIAN. The MERIDIAN is a U.S.-built, U.S.-documented non-hopper[4] dredge, owned by Bean Meridian, LLC. Non-hopper dredges, which are smaller and more numerous than hoppers, facilitate the bulk of coastwise dredging projects. Plaintiff does not claim that the use of the dredge MERIDIAN is a violation of the applicable statute. Rather, plaintiff contends that intervenor, a Delaware limited liability corporation, cannot charter MERIDIAN under applicable law. Stuyvesant Dredging Company, Inc., a for-

---

1. The Corps agreed not to issue a notice to proceed, provided that the court ruled on plaintiff's request for a permanent injunction by close of business on October 14, 2003. To that end, the parties requested an accelerated briefing schedule. The complaint was filed on September 25, 2003, followed on September 26 by a preliminary conference to schedule a hearing on plaintiff's application for a temporary restraining order. Intervenor came into the proceedings on September 29. At a scheduling conference held on September 30, the parties agreed to submit simultaneous opening briefs on October 3, with the second round on October 8 and 9. The parties requested a decision by October 14, which was also the first date on which counsel for all parties could participate in oral argument. The court has endeavored to accommodate the parties' needs.

2. The parties entered into an agreement whereby the Government awarded the contract to intervenor notwithstanding this litigation. If this courts rules for the Government, the Corps will issue to

intervenor a notice to proceed with performance. If this court enters an injunction, the Government and intervenor have agreed that the contract will be terminated for the convenience of the Government and that no costs will be assessed.

3. Documented vessels are nationally registered with the U.S. Coast Guard, as opposed to a local or foreign state. Most commercial vessels must be documented, and to qualify the vessel must be wholly owned by a U.S. citizen or U.S. entity with at least 75% U.S. ownership. *See generally* 46 U.S.C. app. § 12101 (2000); 46 C.F.R. § 67 (2002).

4. A hopper dredge is a self-propelled ocean-going vessel that pumps dredge material from the channel floor and stores that material in containers (hoppers) on board the vessel. Non-hopper vessels do not have the ability to store removed material on board; rather, it must be piped to a separate vessel or location.

eign corporation, and Bean Dredging, LLC, a U.S. entity, each own 50% of intervenor. Stuyvesant Dredging Company, in turn, is owned by Royal Boskalis Westminster, NV, a Dutch conglomerate.

While intervenor is 50% foreign owned, 46 U.S.C. app. § 292 contains an exception that includes Stuyvesant Dredging Company and any entity in which it has an interest. At issue is whether intervenor legally may charter a U.S.-built and -documented non-hopper dredge under the exception to 46 U.S.C. app. § 292 of the Oceans Act of 1992, found at section 5501(a)(2) of Pub.L. No. 102–587. This exception applies to the vessel STUYVESANT, which, in 1982 began a 40–year charter to Stuyvesant Dredging Company; chartering activities involving hopper and non-hopper vessels of Stuyvesant Dredging Company itself and entities in which the company has an interest; and other dredging vessels described by their ownership or activities. The focus is on the provision governing non-hopper vessels.

### DISCUSSION

1. *Jurisdiction and standard of review*

Jurisdiction in the Court of Federal Claims is prescribed by the Tucker Act, 28 U.S.C. § 1491(b)(1) (2000), which allows a protestor to challenge "the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." The court evaluates the procuring agency's conduct to determine whether the Government's decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed.Cir.2003) (applying "arbitrary and capricious" standard of section 706 under 28 U.S.C. § 1491(b) in post-award bid protest action where Federal Circuit decided "whether the Air Force's procurement decision was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'"). If a protestor satisfies its burden in proving the requisite violation, the court may award equitable relief pursuant to 28 U.S.C. § 1491(b)(2).

Provisions of the Federal Acquisition Regulation ("FAR"), as incorporated into the solicitation, require that "contracts shall be awarded to[ ] responsible prospective contractors only," and to be determined responsible, a contractor must, *inter alia*, "[b]e otherwise qualified and eligible to receive an award under applicable laws and regulations." 48 C.F.R. (FAR) §§ 9.103—9.104–1 (2002). Plaintiff argues that, because intervenor does not qualify for the exception to the 1992 amendment, it is not a "responsible" contractor in that it is not "otherwise eligible and qualified," thereby failing to satisfy 48 C.F.R. § 9.104–1(g).

Plaintiff contends that the relevant provisions of the Oceans Act prohibit intervenor from chartering vessels to dredge in waters of the United States. The Oceans Act amended the Foreign Dredge Act of 1906, which previously had allowed foreign entities to charter U.S.-owned dredges and operate in the United States. After the 1992 amendment, the charterer of the vessel must be a U.S. citizen or an entity with at least 75% U.S.-citizen control. 46 U.S.C. app. §§ 292, 802. The Oceans Act included an exception for the vessel STUYVESANT and Stuyvesant Dredging Company. Plaintiff puts forward that the exception was intended to allow Stuyvesant Dredging Company to continue performance of dredging projects utilizing the hopper dredge STUYVESANT and, if it became disabled, to replace the vessel with other hopper or non-hopper vessels owned either solely by the company or an entity in which it has an interest.

The exception to 46 U.S.C. app. § 292, Pub.L. 102–587 § 5501(a)(2) provides, in pertinent part, as follows:

"The amendment made by paragraph (1) [amending this section] does not apply to—

"(A) (i) The vessel STUYVESANT . . . .

"(ii) any other hopper dredging vessel documented under chapter 121 of title 46, United States Code before the effective date of this Act [Nov. 4, 1992] and chartered to Stuyvesant Dredging Company or to an entity in which it has an ownership interest; however, this exception expires on December 3, 2022 or when the vessel STUYVESANT ceases to be documented

under chapter 121, whichever first occurs; and

"(iii) any other non-hopper dredging vessel documented under chapter 121 and chartered to Stuyvesant Dredging Company or to an entity in which it has an ownership interest, as is necessary (a) to fulfill dredging obligations under a specific contract, including any extension periods; or (b) as temporary replacement capacity for a vessel which has become disabled but only for so long as the disability shall last and until the vessel is in a position to fully resume dredging operations; however, this exception expires on December 8, 2022 or when the vessel STUYVESANT ceases to be documented under chapter 121, whichever first occurs; ...

Plaintiff charges that the Government, through the Bureau of Customs and Border Protection, improperly interpreted the exception to allow Stuyvesant Dredging Company and/or intervenor to expand its business into segments of the dredging industry in which it did not operate before the restriction was enacted.

Defendant counters that intervenor is qualified to perform the contract by chartering the non-hopper vessel MERIDIAN. The applicable section (A)(iii) exception to 46 U.S.C. app. § 292(a) of the Oceans Act, according to defendant, has four requirements: 1) the vessel must be a non-hopper dredge; 2) the vessel must be documented under Chapter 121 of Title 46; 3) the vessel must be chartered to Stuyvesant Dredging Company, or to an entity in which it has an

ownership interest, to fulfill dredging obligations under a specific contract; and 4) the dredging must take place prior to December 8, 2022, or when the vessel STUYVESANT ceases to be documented, whichever occurs first. The parties dispute the effect of requirement three, which defendant argues, rather than maintaining the status quo, allows Stuyvesant Dredging Company (or its parent Royal Boskalis, through Stuyvesant) to expand its dredging operations by entering into new contracts and spawning new entities with no limitation on its ownership interest.[5]

### 2. *Customs' determinations*

The Bureau of Customs and Border Protection ("Customs")[6] is empowered to issue letter rulings describing its official position regarding interpretation of maritime laws. 19 C.F.R. § 177.9 (2002). Three letter rulings have been issued regarding the subsection (A)(iii) exception of the Oceans Act—one involving intervenor and two involving Stuyvesant Dredging Company, the 50%-owner of intervenor. Although Customs' decisions may be cited as authority for a similar transaction, "no other person should rely on the ruling letter or assume that the principles of that letter will be applied in connection with any transaction other than the one described in the letter." 19 C.F.R. § 177.9(c). Customs has the right to modify or revoke a letter ruling at any time. *Id.*

Defendant and intervenor urge the court to sustain Customs' interpretation of the exception. "[C]onsiderable weight should be

---

**5.** Intervenor argues that plaintiff's suit is an improper collateral attack on Customs' interpretation. 5 U.S.C. § 702 (2000) confines challenges to administrative agency action, not involving money damages, to federal district court. Plaintiff challenges the contracting officer's responsibility determination. The contracting officer specifically utilized 46 U.S.C. app. § 292 to render an independent determination based on the facts and information available. The contracting officer was not bound by prior Customs determinations involving different facts. *Stapp Towing, Inc. v. United States*, 34 Fed.Cl. 300, 302 (1995) (acknowledging that, although bound by determination of the Small Business Administration regarding Certificate of Competency, contracting officer has discretion to award contract "based on independent judgment and new information"). Plaintiff is challenging the contracting

officer's decision, which reflects his independent judgment informed by Customs decisions, as not in accordance with law. After January 1, 2001, the Court of Federal Claims is the only forum with jurisdiction over a bid protest that challenges a contracting officer's determination as not in accordance with law. 28 U.S.C. § 1491(b)(1).

It should be noted that defendant does not support intervenor's argument that jurisdiction lies in another forum.

**6.** On March 1, 2003, the U.S. Customs Service was merged with the Border Patrol and made part of the new Department of Homeland Security, prior to which Customs was part of the Department of Transportation.

accorded to an executive department's construction of a statutory scheme it is entrusted to administer." *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). This standard applies so long as "it appears from the statute or its legislative history that the accommodation is not one that Congress would have sanctioned." *United States v. Shimer*, 367 U.S. 374, 383, 81 S.Ct. 1554, 6 L.Ed.2d 908 (1961). "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 842–43, 104 S.Ct. 2778.

Only when the court determines that Congress has not addressed the precise issue directly is it necessary to consult an administrative interpretation: When the "statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843, 104 S.Ct. 2778. In the present case, the statute is neither silent nor ambiguous with respect to the exception to 46 U.S.C. app. § 292. Where the "plain meaning" of the statute is invoked, the need does not arise for the court to consult administrative interpretations, within the framework prescribed in *Chevron*.

"'If a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect.'" *Kilpatrick v. Principi*, 327 F.3d 1375, 1384 (Fed.Cir.2003) (quoting *Chevron*, U.S. at 843 n. 9, 845). "'We only defer ... to agency interpretations of statutes that, applying the normal "tools of statutory construction," are ambiguous.'" *Kilpatrick*, 327 F.3d at 1384 (quoting *INS v. St. Cyr*, 533 U.S. 289, 320 n. 45, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001)). However, the Supreme Court has held that *Chevron* deference does not apply to all administrative interpretations, even where the underlying statute is ambiguous. *United States v. Mead Corp.*, 533 U.S. 218, 231, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001) (denying *Chevron* deference to Customs' letter ruling interpreting

tariff regulations when no indication was present that Congress delegated lawmaking authority allowing Customs to make classifications).

The parties have not argued that 46 U.S.C. app. § 292 gives any indication that Congress intended to delegate rule-making authority to Customs. Section 251b of the same act allows the Secretary of the Treasury to issue regulations "necessary for the enforcement of the provisions of this act." The statute indicates that Congress delegated enforcement, rather than rule-making authority.

Customs' interpretations may still "merit some deference whatever its form, given the 'specialized experience and broader investigations and information' available to the agency." *Mead Corp.*, 533 U.S. at 234, 121 S.Ct. 2164 (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 139, 65 S.Ct. 161, 89 L.Ed. 124 (1944)). This "power to persuade" of an administrative agency determination is limited by the "merits of its writer's thoroughness, logic, and expertness, and its fit with prior interpretations, and other sources of weight." *Id.* at 235, 121 S.Ct. 2164; *see also Washington State Dep't of Soc. & Health Servs. v. Guardianship Estate of Keffeler*, 537 U.S. 371, 123 S.Ct. 1017, 1026, 154 L.Ed.2d 972 (2003) (administrative interpretations not product of formal rulemaking "warrant respect in closing the door on any suggestion that the usual rules of statutory construction should get short shrift").

Customs issued a letter ruling sought by Stuyvesant Dredging Company addressing whether the subsection (A)(iii) exception allowed Stuyvesant Dredging Company to charter a non-hopper dredge for a contract that the STUYVESANT could not perform. HQ 114247 (Feb. 17, 1998), 1998 U.S. Custom HQ LEXIS 538. Customs announced a four-element test that allows: 1) non-hopper dredges; 2) documented under 46 U.S.C. § 12101; 3) chartered to Stuyvesant Dredging Company to fulfill obligations under a specific contract; which 4) is completed prior to December 8, 2022, or when STUYVESANT ceases to be documented. *Id.* at 3. Customs determined that no ambiguity inhered in the exception requiring a departure from the "plain language." *Id.* Without fur-

ther analysis, Customs concluded that Stuyvesant Dredging Company may charter a non-hopper for dredging in the United States. *Id.*

Stuyvesant Dredging Company next sought a letter ruling allowing it to form a separate company in partnership with a U.S. entity, with the new entity engaging in chartering non-hopper dredges for use on a contract-by-contract basis. HQ 114556 (Dec. 15, 1998), 1998 U.S. Custom HQ LEXIS 935. Customs again determined that the exception was clear on its face and, without further discussion ("it is readily apparent"), stated that the new entity may charter non-hopper dredges under the four-part test. *Id.* at 3.

The Corps requested a ruling as to the. legality of allowing intervenor, an entity in which Stuyvesant Dredging Company has an interest, to charter non-hopper dredges, sought its own letter ruling, HQ 115474 (Oct. 5, 2001), 2001 U.S. Custom HQ LEXIS 317. Customs reiterated its position that the exception is unambiguous and that intervenor clearly meets the four requirements. *Id.*[7]

Customs relied on HQ 114556 as authority in deciding HQ 115474, because the former did involve a joint venture similar to intervenor, with similar underlying facts. *Id.*

When interpreting the four requirements of the subsection (A)(iii) exception, Customs failed to analyze the effect of requirement three in conjunction with the entirety of the exception. The statutory language limits non-hopper charters to those "necessary (a) to fulfill dredging operations under a specific contract, including any extension periods; or (b) as temporary replacement capacity for a vessel which has become disabled but only for so long as the disability shall last and until the vessel is in a position to fully resume dredging." Customs, invoking the plain meaning, determined that any dredging contract entered into by Stuyvesant Dredging Company or an entity in which it has an interest would fulfill dredging operations under a specific contract. In reading the exception, Customs gave no consideration to

the phrases "necessary to fulfill," "extension periods," or the language of subsection (b)(ii) concerning "temporary replacement." Moreover, Customs ignored the relationship between subsections (A)(ii) and (A)(iii) insofar as the former restricts hoppers to those documented as of the date of enactment and the latter, applicable to non-hoppers, contains the phrases quoted above that do not appear in the exception for hopper dredges, subsection (A)(ii). Customs made no attempt to read these three exceptions in context.

In defending Customs' interpretation, defendant argues "the use of 'as is necessary' in clause 2(A)(iii) is not ambiguous if the language is read in context, as it should be." Def.'s Br. filed Oct. 9, 2003, at 12. When listing the four requirements of (A)(iii), Customs excluded the language "as is necessary." HQ 114247; HQ 114556; HQ 115474. By making no mention of this phrase, Customs ignored whatever effect it may have.

■ Customs based its decision on the plain meaning of the statutory exception, a determination that this court may review without deference. *See Demarest v. Manspeaker*, 498 U.S. 184, 190, 111 S.Ct. 599, 112 L.Ed.2d 608 (1991) (holding administrative interpretation of statute under plain language not entitled to deference). Given Customs' limited examination of the statute, failure to consider all the statutory language, consideration of some phrases out of context, and failure to consider the exception as a whole, this court proceeds to conduct its own analysis of the requirements of the subsection (A)(iii) exception.

3. *Application of legislative history and canons of statutory construction*

■ The Supreme Court has discussed at length the rule for determining when and how to apply an act's legislative history. *See, e.g., Blanchard v. Bergeron*, 489 U.S. 87, 99, 109 S.Ct. 939, 103 L.Ed.2d 67 (1989) (Scalia, J., concurring); *Green v. Bock Laundry Mach. Co.*, 490 U.S. 504, 509–11, 109 S.Ct.

---

7. In HQ 115474, Customs determined that HQ 114247 did not constitute authority for the current issue. HQ 114247 involved Stuyvesant Dredging Company, not a joint venture with Bean Dredging, LLC, as well as different performance requirements on a contract that the vessel STUYVESANT could not perform due to size constraints. *Id.* at 7.

1981, 104 L.Ed.2d 557 (1989); *Public Citizen v. U.S. Dep't of Justice,* 491 U.S. 440, 453–54, 109 S.Ct. 2558, 105 L.Ed.2d 377 (1989). In interpreting a statute, a court must begin with the language of the statute itself. *Demarest,* 498 U.S. at 187, 111 S.Ct. 599; *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 64 L.Ed.2d 766 (1980).

■ The court then decides whether the language of the statute is ambiguous. Generally, if the language is unambiguous, the court may not refer to the legislative history. *HUD v. Rucker,* 535 U.S. 125, 132, 122 S.Ct. 1230, 152 L.Ed.2d 258 (2002); *United States v. Gonzales,* 520 U.S. 1, 6, 117 S.Ct. 1032, 137 L.Ed.2d 132 (1997). In the event, however, that a literal reading of the plain language would "compel an odd result," the court must examine the legislative history in order properly to construe the rule, irrespective of the text's ambiguity. *Green,* 490 U.S. at 509–11, 109 S.Ct. 1981 (ambiguous text); *see also Conroy v. Aniskoff,* 507 U.S. 511, 514, 113 S.Ct. 1562, 123 L.Ed.2d 229 (1993) (unambiguous text). "Unquestionably the courts, in interpreting a statute, have some 'scope for adopting a restricted rather than a literal or usual meaning of its words where acceptance of that meaning would lead to absurd results ... or would thwart the obvious purpose of the statute.'" *Commissioner v. Brown,* 380 U.S. 563, 571–72, 85 S.Ct. 1162, 14 L.Ed.2d 75 (1965) (citations omitted) (holding, however, that statute not construed too broadly or contrary to the purpose of the Internal Revenue Code). When interpreting unambiguous statutory language, judicial inquiry is sufficient except where its application as written is " 'demonstrably at odds with the intentions of its drafters.'" *Demarest,* 498 U.S. at 190, 111 S.Ct. 599 (quoting *Griffin v. Oceanic*

*Contractors, Inc.,* 458 U.S. 564, 571, 102 S.Ct. 3245, 73 L.Ed.2d 973 (1982)); *see also Consumer Prod. Safety Comm'n,* 447 U.S. at 108, 100 S.Ct. 2051.

■ Legislative history is considered when necessary to respond to a party's argument that a literal interpretation would produce an absurd result. In *Conroy* the Supreme Court held that the statute in question was "unambiguous, unequivocal, and unlimited." 507 U.S. at 514, 113 S.Ct. 1562. Respondents argued not against the plain meaning, but that, in the context of the statute as a whole, the textual interpretation produced an absurd result. *Id.* The Court therefore proceeded to analyze the implications of the legislative history, although ultimately rejecting respondents' argument. *Id.* at 514–18, 113 S.Ct. 1562.[8]

In *Green* the Supreme Court considered whether Fed.R.Evid. 609(a)(1) allowed a civil litigant to attack his adversary's credibility through prior felony convictions. 490 U.S. at 505, 109 S.Ct. 1981. The literal reading of the rule provided a civil defendant rights in connection with impeaching an adversary's testimony that it denied a civil plaintiff. *Id.* at 510, 109 S.Ct. 1981. Following a thorough consultation of the rule's legislative history, including the actions of a "distinguished Advisory Committee appointed at the recommendation of the Judicial Conference of the United States," the House and the Senate, and their corresponding reports, the Court determined that the rule required a "judge to permit impeachment of a civil witness with evidence of prior felony convictions regardless of ensuant unfair prejudice to the witness or the party offering the testimony." [9] *Id.* at 515, 527, 109 S.Ct. 1981.

---

8. In his concurring opinion, Justice Scalia wrote that, because the Court held the statute to be unambiguous, all further discussion of legislative history in support of the Court's decision was "false and disruptive." *Conroy,* 507 U.S. at 519, 113 S.Ct. 1562 (Scalia, J., concurring). "The greatest defect of legislative history is its illegitimacy. We are governed by laws, not by the intentions of legislators." *Id.*

Justice Scalia has cautioned that "committee reports ... are increasingly unreliable evidence of what the voting Members of Congress actually

had in mind." *Blanchard,* 489 U.S. at 99, 109 S.Ct. 939 (Scalia, J., concurring).

9. Justice Scalia agreed that the statute would produce an absurd result and that legislative history should be consulted, although he wrote separately indicating that the emphasis should be on the interpretation most consonant with ordinary usage and thus most likely the meaning adopted by the entire Congress, rather than the Committee Reports likely read by only a few Members of Congress. *Green,* 490 U.S. at 527–28, 109 S.Ct. 1981 (Scalia, J., concurring).

The Supreme Court in *Public Citizen* addressed the question of whether the Federal Advisory Committee Act (the "FACA") applies to the advisory relationship between the Department of Justice and the American Bar Association's Standing Committee on Federal Judiciary in the context of federal judgeship appointees. 491 U.S. at 443, 109 S.Ct. 2558. The Court analyzed whether the "advisory committee" is "utilized" by the President "as Congress intended that term to be understood." *Id.* at 452, 109 S.Ct. 2558. In explaining the standard, the Court stated that, where the "literal reading of a statutory term would 'compel an odd result,' …we must search for other evidence of congressional intent to lend the term its proper scope." [10] *Id.* at 454, 109 S.Ct. 2558 (quoting *Green,* 490 U.S. at 509, 109 S.Ct. 1981). "Looking beyond the naked text for guidance is perfectly proper when the result it apparently decrees is difficult to fathom or where it seems inconsistent with Congress' intention." *Id.* at 455, 109 S.Ct. 1981. The Court held that Congress could not have intended the FACA to apply to all groups of two or more persons from which the President seeks advice or to consultations with his own political party be-

fore selecting a Cabinet member—an odd result—and thus, examination of legislative intent was appropriate. *Id.* at 453–54, 109 S.Ct. 1981.

The discussion does not end here, however, as the Court of Federal Claims also is bound by the precedent of the United States Court of Claims and the Court of Appeals for the Federal Circuit. *See South Corp. v. United States,* 690 F.2d 1368, 1370 (Fed.Cir.1982) (stating Federal Circuit bound by precedent of former Court of Claims). Moreover, as this court has stated, "when interpreting the decisions of the Federal Circuit, the Court of Federal Claims must endeavor to harmonize precedent to preserve a coherent body of law." *RCS Enters., Inc. v. United States,* 46 Fed.Cl. 509, 517 (2000).

The Federal Circuit agrees that statutory interpretation begins with the language of the statute. *VE Holding Corp. v. Johnson Gas Appliance Co.,* 917 F.2d 1574, 1579 (Fed.Cir.1990) (citing cases). *But see Texas State Comm'n for the Blind v. United States,* 796 F.2d 400, 406 (Fed.Cir.1986) (en banc) (quoting *United States v. Turkette,* 452 U.S. 576, 580, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981)).[11]

**10.** The Court *"explicitly reject[ed]"* the absurdity standard, holding that an "odd result" could also require inquiry into congressional intent. *Public Citizen,* 491 U.S. at 454, n. 9, 109 S.Ct. 2558. Apparently, extending the FACA's requirements to any two people from whom the President seeks advice is thus an "odd," though not necessarily "absurd" result. *See id.* at 452, 109 S.Ct. 2558. This appears to be a fine-line distinction.

**11.** While quoting *Turkette's* language indicating that a court must begin with the plain language, the Federal Circuit, in construing an exemption to the Randolph–Sheppard Vending Stand Act, 20 U.S.C. § 107d3(d), providing, in part, that certain subsections shall not apply to "income from vending machines within retail sales outlets under the control of exchange or ships' stores systems," began by discussing its review of the legislative history and concluded that the funds in question were to be diverted at no cost to the Government and without any decrease in government services, despite characterizing some of the legislative history as "confusing." *Texas,* 796 F.2d at 407 n. 9. The court discussed statements submitted in support of the bill's enactment, the circumstances giving rise to addition of the exemption, a senator's explanation of the bill, and the process preceding its passage in the House of Representatives. *Id.* at 407–11. The actions of the administrative agency in charge of drafting the regulations also were considered,

yet no deference was accorded based on its internal vacillations and the agency's failure to propose its own interpretation of the statutory language. *Id.* at 411–12. In determining the statutory purpose, the court examined "not simply the purpose of the legislation, but the purpose of the *exemption." Id.* at 414. Then, "[g]iven the congressional purpose of the exemption, the question becomes whether the language can reasonably be interpreted … to effectuate that purpose." *Id.* The court decided not to parse the lines of this statute, however, because Congress did not debate and carefully choose the wording of the exemption in question. *Id.* at 415.

On the other hand, the compelling dissenting opinion in this case found nothing ambiguous in the statutory language. *Id.* at 417. By ignoring the statutory words "within retail sales outlets," the majority rewrote the statute, according to the dissenters. *Id.* The dissent reasoned that no absurdity resulted from applying the statute as written; rather the "distinction between machines within retail stores and those in other locations appear[ed] to be consistent with Congress' goals and of the compromise struck between the exchange system and the blind." *Id.* at 422–23. Accordingly, the dissent's analysis began and ended with the plain meaning, addressing the risks associated with relying on legislative history

When unambiguous, the language controls, unless legislative intent is clearly contrary or when its application produces a "result so unlikely that Congress could not have intended it." *VE Holding Corp.*, 917 F.2d at 1580. In *VE Holding*, the Federal Circuit interpreted an amendment to chapter 87 of 28 U.S.C. § 1391(c) and, in so doing, examined the legislative history of the amendment to indicate that no intent was evidenced contrary to the statute. *Id.* at 1580. In general, the court should assume that the ordinary meaning of the language expresses the legislative intent. *Id.* at 1581. The Federal Circuit in *Martin J. Simko Construction, Inc. v. United States*, 852 F.2d 540 (Fed.Cir.1988), stated that only where the legislative intent runs contrary to the statutory text should the court consult the legislative history and examine legislative history upon concluding that the language was not clear. *See George E. Warren Corp. v. United States*, 341 F.3d 1348, 1353 (Fed.Cir.2003) (examining legislative history in order to reject appellant's statutory interpretation argument that incongruous references in legislative history should "trump" plain meaning interpretation).

■ The foregoing precedent instructs that an interpretation consistent with the plain meaning is preferred to cobbling a meaning from the statute's legislative history. A court derives the plain meaning of a statute from its text and structure. *Alexander v. Sandoval*, 532 U.S. 275, 288, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001). And, importantly, the statute must be read as a whole. *Conroy*, 507 U.S. at 515, 113 S.Ct. 1562. "The plain meaning that we seek to discern is the plain meaning of the whole statute, not of isolated sentences." *Beecham v. United States*, 511 U.S. 368, 372, 114 S.Ct. 1669, 128 L.Ed.2d 383 (1994) (construing together three provisions of federal firearms statutes). Where Congress introduces language in one section yet omits it in another, the disparate inclusion or exclusion is deemed intentional. *Duncan v. Walker*, 533 U.S. 167, 173–74, 121 S.Ct. 2120, 150 L.Ed.2d 251 (2001); *see also Ad Hoc Comm. of AZ–NM–TX–FL Producers of Gray Portland Cement v. United*

*States,* 13 F.3d 398, 401 (Fed.Cir.1994) (citing cases) ("[W]here Congress has included specific language in one section of a statute but has omitted it from another, related section of the same Act, it is generally presumed that Congress intended the omission.").

In *Duncan* the Supreme Court interpreted a statute that provided: " 'The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.' " 533 U.S. at 169, 121 S.Ct. 2120. The Court compared this text with other portions of the statute where "federal" was specifically mentioned and concluded that its omission entailed that an application for federal review would not toll the statute of limitations as did applications for state review. *Id.* at 173–74, 121 S.Ct. 2120. This interpretation also avoided rendering superfluous any words in the statute. *Id.* at 174, 121 S.Ct. 2120. The Court must " 'give effect, if possible, to every clause and word of a statute.' " *Id.* (quoting *United States v. Menasche*, 348 U.S. 528, 538–39, 75 S.Ct. 513, 99 L.Ed. 615 (1955)). The Court also hesitates to employ a construction rendering statutory language redundant. *United States v. Alaska*, 521 U.S. 1, 59–61, 117 S.Ct. 1888, 138 L.Ed.2d 231 (1997).

Yet, these canons of statutory construction are applied with caution, as the Supreme Court has indicated that a canon pointing a court in one direction may often be countered with a maxim moving the court in a different direction. *Chickasaw Nation v. United States*, 534 U.S. 84, 94, 122 S.Ct. 528, 151 L.Ed.2d 474 (2001). Canons are not binding rules; they provide guidance to determine legislative intent "as embodied in particular statutory language." *Id.* The Court nonetheless referred to the canon requiring that each word be given effect, if possible, noting that it sometimes is offset by the canon permitting a court to reject surplusage. *Id.* The Court applied this rule in *National Credit Union Administration v. First National Bank & Trust Co.*, 522 U.S. 479, 502–03, 118 S.Ct. 927, 140 L.Ed.2d 1 (1998) adopting the

that may distort any true congressional intent, if   one coherent intent existed. *Id.* at 427.

interpretation that avoided surplusage and ensuring that similar language contained in the same section was interpreted in the same way.

### 4. *Interpretation of statutory provision based on its plain meaning*

■ 46 U.S.C. app. § 292(a) provides as follows:

### § 292. Vessels that may engage in dredging

#### (a) In general

Except as provided in subsection (b) of this section, a vessel may engage in dredging in the navigable waters of the United States only if—

(1) the vessel meets the requirements of section 883 of this Appendix and sections 802 and 803 of this Appendix for engaging in the coastwise trade;

(2) when chartered, the charterer of the vessel is a citizen of the United States under section 802 and 803 of this appendix for engaging in the coastwise trade; and

(3) for a vessel that is at least 5 net tons, the vessel is documented under chapter 121 of title 46 with a coastwise endorsement.

Public Law 102–587 amended 46 U.S.C. app. § 292, "Vessels that may engage in dredging," commonly referred to as the "Foreign Dredge Act." Prior to amendment, the act provided: "A foreign-built dredge shall not, under penalty of forfeiture, engage in dredging in the United States unless documented as a vessel of the United States." 46 U.S.C. app. § 292. The current version references several other sections of the United States Code. For example, section 883 entitled "Transportation of merchandise between points in United States in other than domestic built or rebuilt and documented vessels; incineration of hazardous waste at sea" provides, in part, that "[n]o merchandise ... shall be transported by water ... between points in the United States ... in any other vessel than a vessel built in and documented under the laws of the United States and owned by persons who are citizens of the United States ...." Section 802 of the Ship-

ping Appendix entitled "Corporation, partnership, or association as citizen," provides, in part:

Within the meaning of this chapter no corporation, partnership, or association shall be deemed a citizen of the United States unless the controlling interest therein is owned by citizens of the United States, and, in the case of a corporation, unless its chief executive officer, by whatever title, and the chairman of its board of directors are citizens of the United States and unless no more of its directors than a minority of the number necessary to constitute a quorum are noncitizens and the corporation itself is organized under the laws of the United States ... but in the case of a corporation, association, or partnership operating any vessel in the coastwise trade the amount of interest required to be owned by citizens of the United States shall be 75 per centum.

Section 803 states that "[t]he provisions of this chapter shall apply to receivers and trustees of all persons to whom the chapter applies, and to the successors or assignees of such persons." The above-referenced chapter 121, entitled "Documentation of vessels" is found at 46 U.S.C. §§ 12101–12124 and delineates which vessels are eligible for documentation, the effect of documentation, the registry of endorsements and certain limitations and penalties. Specifically, § 12102, "Vessels eligible for documentation" provides, in part, that a vessel that is "not registered under the laws of a foreign country is eligible for documentation if the vessel is owned by ... a corporation established under the laws of the United States or of a state, whose chief executive officer, by whatever title, and chairman of its board of directors are citizens of the United States and no more of its directors are noncitizens than a minority of the number necessary to constitute a quorum."

Accordingly, because the parties agree that the vessel MERIDIAN, chartered by the joint venture Bean Stuyvesant, LLC, fails to meet the 75% U.S.-ownership provisions of sections 802–803, required by 46 U.S.C. app. § 292(a)(2), the court looks to the

exception to the 1992 amendment entitled "Nonapplicability to Certain Vessels."

. The exception to 46 U.S.C. app. § 292(a), Pub.L. 102–587 § 5501(a)(2), provides, in full:

### NONAPPLICABILITY TO CERTAIN VESSELS

Section 5501(a)(2) of Pub.L. 102–587 provided that:

"The amendment made by paragraph (1) [amending this section] does not apply to—

"(A)(i) the vessel STUYVESANT, official number 648540;

"(ii) any other hopper dredging vessel documented under chapter 121 of title 46, United States Code before the effective date of this Act [Nov. 4, 1992] and chartered to Stuyvesant Dredging Company or to an entity in which it has an ownership interest; however, this exception expires on December 3, 2022 or when the vessel STUYVESANT ceases to be documented under chapter 121, whichever first occurs; and

"(iii) any other non-hopper dredging vessel documented under chapter 121 and chartered to Stuyvesant Dredging Company or to an entity in which it has an ownership interest, as is necessary (a) to fulfill dredging obligations under a specific contract, including any extension periods; or (b) as temporary replacement capacity for a vessel which has become disabled but only for so long as the disability shall last and until the vessel is in a position to fully resume dredging operations; however, this exception expires on December 8, 2022 or when the vessel STUYVESANT ceases to be documented under chapter 121, whichever first occurs;

"(B) the vessel COLUMBUS, official number 590658, except that the vessel's certificate of documentation shall be endorsed to prohibit the vessel from engaging in the transportation of merchandise (except valueless material), including dredge material of value, between places within the navigable waters of the United States;

"(C) a vessel that is engaged in dredged material excavation if that excavation is not more than a minority of the total cost of the construction contract in which the excavation is a single, integral part, and the vessel is—

"(i) built in the United States;

"(ii) a non-self-propelled mechanical clamshell dredging vessel; and

"(iii) owned or chartered by a corporation that had on file with the Secretary of Transportation, on August 1, 1989, the certificate specified in section 27A of the Merchant Marine Act, 1920 (46 App. U.S.C. 883–1); or

"(D) any other documented vessel engaged in dredging and time chartered to an entity that, on August 1, 1989, was, and has continuously remained, the parent of a corporation that had on file with the Secretary of Transportation on August 1, 1989, a certificate specified in section 27A of the Merchant Marine Act, 1920 (46 App. U.S.C. 883–1) if the vessel is—

"(i) not engaged in a federally funded navigation dredging project; and

"(ii) engaged only in dredging associated with, and integral to, accomplishment of that parent's regular business requirements."

The court concludes that the relevant exception in the 1992 amendment is amenable to a construction based on its plain meaning. The exception contains four exemptions from the prohibition. The exception states that the prohibition of less than 75% U.S.-citizen-owned vessels that may engage in dredging does not apply to two vessels, the STUYVESANT and the COLUMBUS, and two other types of vessel described by either the percentage participation or status of chartering entity. Each of these is a limited exception directed to a vessel, not to a company. COLUMBUS is exempted, yet is prohibited from transporting dredge material of value between places within navigable U.S. waters. Section (C) exempts vessels engaged in dredged material excavation only if it is a minor part of a larger construction contract and the vessel was "owned or chartered by a corporation that had on file with the Secretary of Transportation, on August 1, 1989, the certificate specified in section 27A of the Merchant Marine Act, 1920 (46 App. U.S.C.

883–1).'' The exemption in section (D) is limited to documented vessels chartered to certain entities satisfying the August 1, 1989 documentation requirements and not engaged in federally funded navigation dredging projects. All four of these exceptions thus are directed to vessels, not to any named or otherwise described company.

With respect to the vessel STUYVESANT, the exception applies to three types of vessels: the STUYVESANT itself, other hopper vessels, and non-hopper vessels. All three types of dredging vessels must be documented as required. The hopper and non-hopper vessels must be chartered to Stuyvesant Dredging Company or to an entity in which it has an ownership interest. The exception is delimited further in that it is finite: The exception expires at the earlier of 30 years or when the vessel STUYVESANT ceases to be documented.

With respect to hopper vessels, the exception imposes the limitation that they be documented before the effective date of the Oceans Act—November 4, 1992.

With respect to non-hopper vessels, like the vessel MERIDIAN, Congress further delimited the exception to the 1992 amendment. The exception to non-hopper vessels only applies in two circumstances: The activities of the dredge must be deemed necessary to fulfill dredging obligations under a specific contract, including any extension periods; or, alternatively, the dredge must be serving in a temporary replacement capacity for a vessel that has become disabled. This alternative is delimited even further insofar as the replacement can run only for so long as the disability shall last and until the temporarily replaced vessel is in a position to fully resume dredging operations. This exception does not require that the vessels be documented as of November 4, 1992.

These provisions must be construed together and complement each other harmoniously. Under subsection (A)(i), the vessel STUYVESANT can perform dredging operations however chartered until, at a maximum, the end of its long-term charter (30 years). Under subsection (A)(ii), Stuyvesant Dredging Company or an entity in which it has an interest can charter a hopper, as long

as it was documented before 1992, to engage in any dredging operation. These two provisions are directed to hopper vessels and contemplate future operations utilizing only hopper vessels that were in existence as of enactment. Under subsection (A)(iii), Stuyvesant Dredging Company or an entity in which it has an interest can utilize any non-hopper, even if not yet built, to fulfill contracts entered into utilizing STUYVESANT or any other qualified hopper. In other words, the non-hoppers would be supplemental to the dredging activities involving hoppers. Also, a non-hopper so chartered can be used as a temporary replacement for a hopper. The latter event would occur when a contract is being performed only by a hopper that has become disabled. Illustratively, (A)(iii)(b) would apply in the following scenario: Intervenor is engaged in a dredging operation involving a hopper that becomes disabled. Section (A)(iii)(b) would prevent plaintiff from protesting intervenor's substitution of a non-hopper for the temporary replacement of the disabled hopper.

This is the only construction that gives effect to all of the conditions set forth in the exception to the 1992 amendment, interprets the phrases in context, and reads all of subsections (A)(i), (ii), and (iii) together, consonant with subsections (B), (C), and (D). While the wording of the statute cannot be characterized as uncomplicated, its meaning is both plain and clear.

Defendant argues that the vessel MERIDIAN, as chartered by Bean Stuyvesant, LLC, falls within subsection (A)(iii), per the plain meaning of the exception. As defendant reads that subsection, only four requirements must be met: (1) the vessel is a non-hopper dredge; (2) the vessel must be documented under chapter 121 of title 46; (3) the vessel must be chartered to Stuyvesant Dredging Company or to another entity in which it has an ownership interest to fulfill dredging obligations under a specific contract; and (4) the dredging would occur before either December 8, 2022, or the cessation of STUYVESANT'S documentation, whichever occurs first. Defendant sees only the third requirement is in question and argues that Stuyvesant Dredging Company's 50% interest in

Bean Stuyvesant, LLC, satisfies subsection (A)(iii).

This reading, according to defendant, is not contrary to the legislative purpose; it is consistent with 46 U.S.C. app. § 802, which explicitly requires 75% U.S.-citizen ownership. Because Congress demonstrated in that provision that it knew how to draft specific numerical ownership requirements, the omission of any such requirement from subsection (A)(iii) exception to the 1992 amendment was intentional. This aspect of defendant's construction is not material. Plaintiff is not contending that the statute imposes any specific minimum ownership interest in the entity. The exception does not support such a reading, in any event. What defendant insists, however, is that the language contemplates that the exception allows an entity formed after the date of enactment.

Defendant characterizes both subsections (A)(ii) and (iii) as "forward looking and [they] contemplate that vessels will in the future be chartered to either Stuyvesant Dredging Co. or to another entity in which it has an ownership interest." Def.'s Br. filed Oct. 9, 2003, at 3. Defendant makes much of the fact that the "only charter of a U.S. flagged vessel that Stuyvesant Dredging Co. possessed on November 4, 1992 (the Act's effective date) was its long-term charter of the dredge STUYVESANT." [12] Id. According to defendant, its position is supported by these facts in conjunction with 1 U.S.C. § 1 ("words in the present tense include the future as well as the present") and case law stating that "undeviating use of the present tense" equates to a cause of action for present or future harm, but not past harm. See Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc., 484 U.S. 49, 59, 108 S.Ct. 376, 98 L.Ed.2d 306 (1987).

Therefore, defendant's proffered plain meaning is that Stuyvesant Dredging Company and any entity in which it has an interest may be eligible for awards of future contracts using non-hopper vessels or temporarily replace any vessel in the future, up to the time the vessel STUYVESANT is no longer in service, which is limited to 30 years.

Agreeing with plaintiff that all three subsections are directed to a vessel, defendant interprets all three subsections only insofar as acknowledging that each has a specific limitation. Defendant concedes that the operation of hopper vessels was the focus at the time the legislation is enacted. The court cannot interpret an exception to a statute that prohibits charters by foreign-owned entities to permit foreign-owned entities to charter not yet documented non-hopper vessels to perform future contracts not involving hopper vessels or to provide replacements for any disabled non-hoppers. Such a reading is not consistent with subsections (A)(i) and (A)(ii), which limit the exception to the vessel STUYVESANT and an existing fleet of other hoppers, i.e., the exception cannot swallow the rule.

Intervenor's argument based on plain meaning parallels that of defendant. Intervenor focuses on the language of the subsection (A)(iii) exception to show that Stuyvesant Dredging Company's 50% ownership interest in intervenor satisfies its requirements. The vessel MERIDIAN is a non-hopper dredge in which Stuyvesant Dredging Company has an ownership interest and the MERIDIAN "will be chartered to Bean Stuyvesant for the length of time needed to complete the contract awarded under Solicitation DACW54–03–B–0011 including any extensions." Intv.'s Br. filed Oct. 3, 2003, at 7. Intervenor notes that subsection (A)(iii), unlike subsection (A)(ii), does not limit non-hopper vessels to those documented as of November 4, 1992. Consequently, intervenor reasons, the plain meaning of the non-hopper exception is that future contracts and activities with later-documented non-hopper vessels are contemplated.

Tellingly, intervenor expresses the subsection (A)(iii) exemption as giving Stuyvesant Dredging Company "a means of operating in the United States." Transcript of Proceedings, Norfolk Dredging Co. v. United States, No. 03–2225C, at —— (Fed.Cl. Oct. 14, 2003) (oral argument). According to intervenor, subsection (A)(iii) is a limitation on contracts,

---

**12.** The relevant legislative history, as discussed below, does not indicate the number of charters possessed by Stuyvesant Dredging Company at the time of enactment. See infra note 17.

not on a specific type of vessel. Intervenor interrelates the three subsections insofar as subsection (A)(i) allows STUYVESANT free reign for the 30–year remainder of its charter and other hoppers chartered to Stuyvesant Dredging Company or an entity in which it has an interest for the same term, as long as these hoppers were documented at the beginning of the period. This activity is not tied to any contract; indeed, these hoppers can "cruise up the Delaware on pleasure cruises." *Id.* Subsection (A)(iii), in contrast, focuses on the contracts on which Stuyvesant Dredging Company and the entity can bid. Thus, intervenor reads the three provisions as separate limitations and does ground subsection (A)(ii) on a vessel.

Each of the three subsections is tied to operations of the vessel STUYVESANT. Defendant and intervenor each urge a plain-meaning construction that ignores the interrelationship of the exception for non-hopper vessels and the provisions for hopper vessels. In doing so, they ignore the canon of statutory interpretation that, if possible, each word in the statute must be given effect. *Chickasaw Nation*, 534 U.S. at 94, 122 S.Ct. 528; *see also Gwaltney*, 484 U.S. at 68, 108 S.Ct. 376 (Scalia, J., dissenting because Court "ignore[d] the words of the statute").[13] "We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 461–62, 122 S.Ct. 941, 151 L.Ed.2d 908 (2002) (quoting *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253–54, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992)).

The plain meaning construction is valid whether or not Stuyvesant Dredging Company had any non-hopper dredging vessels chartered to itself or to an entity in which it had an ownership interest as of the date of enactment. Defendant is correct in that the exception to the 1992 amendment would allow Stuyvesant Dredging Company to join in future entities, and charter through them. Defendant, however, fails to acknowledge that any such entities still are restricted by (A)(iii)(a) and (b), insofar as they may charter non-hopper vessels. An arrangement would satisfy this part of the exception only if the chartered non-hopper vessel "is necessary ... to fulfill dredging obligations under a specific contract replacing a hopper vessel documented as of 1992, including any extension periods," or to complete temporary replacement of contract involving a hopper vessel documented as of 1992. Neither defendant nor intervenor has argued that Bean Stuyvesant, LLC, is chartering the MERIDIAN to fulfill a specific contract in existence, including any extension period, at the time of the enactment.

"The statute is clear on its face, however, as the court ably explains, and thus anything one Senator, or even several Senators, may have said with regard to the statute cannot vary its meaning; it is the statute that is the law, not some selected piece of the legislative record." *Alliant Techsystems, Inc. v. United States*, 178 F.3d 1260, 1277 (Fed.Cir.1999) (Plager, J., concurring). The court should not consult legislative history to bolster its result. In fact, the Supreme Court repeatedly has instructed courts not to so. *Desert Palace, Inc. v. Costa*, 539 U.S. 40, ——, 123

---

**13.** The court agrees with defendant and intervenor that the exception allows Stuyvesant Dredging Company or any entity in which it has an interest to enter into future contracts with its *existing fleet.* Interestingly, defendant *cites to* the majority opinion in *Gwaltney* to make its case that the statute contemplates allowing Stuyvesant Dredging Company to expand its interests in the future. The majority stated that the language and structure of the other provisions in the act, together with the "to be in violation" language, entailed a forward-looking construction. *Gwaltney,* 484 U.S. at 59, 108 S.Ct. 376. In the present case, reading all the provisions together entails a construction with temporal restrictions. Subsection (a)(i) is restricted temporally to the existence of the STUYVESANT; (a)(ii), to any

other hopper documented before November 4, 1992; and (a)(iii), to a non-hopper as "is necessary ... to fulfill dredging obligations under a specific contract, including any extension periods" or as a temporary replacement. As the first two subsections are located temporally in the present, the most logical and natural construction places the third subsection temporally in the present, as well. Moreover, this reading is consonant with *sections (B)-(D) of the exception to* the 1992 amendment. Section (B) limits the exemption to certain activities of the vessel CO-LUMBUS, and both (C) and (D) are temporally restricted to vessels owned and/or chartered by a corporation with certain documentation in place as of August 1, 1989.

S.Ct. 2148, 2153, 156 L.Ed.2d 84 (2003) (stating that with unambiguous statute the judicial inquiry is complete); cf. *Bath Iron Works, Corp. v. United States,* 20 F.3d 1567, 1581–82 (Fed.Cir.1994) (reviewing legislative history where Government argued that it revealed ultimate purpose of act); *Richards Med. Co. v. United States,* 910 F.2d 828, 830 (Fed.Cir.1990) (beginning with plain meaning and then consulting other extrinsic aids, including legislative history, as necessary). As the parties agree that the plain meaning of the statute can be ascertained and controls, legislative history is relevant only if 1) the plain-meaning construction is inconsistent with the stated purpose of the statute, as articulated by Congress, *United States v. Ron Pair Enters., Inc.,* 489 U.S. 235, 242, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989), or 2) if the construction would produce an absurd result, *Commissioner v. Brown,* 380 U.S. at 571–72, 85 S.Ct. 1162; *see also Reid v. Dep't of Commerce,* 793 F.2d 277, 281–82 (Fed.Cir. 1986) (citing cases).

The legislative history is limited.[14] The full language of the exception to the 1992 amendment inspired some pertinent discourse in the House of Representatives. *See* 138 Cong. Rec. 15647 (1992). Representative W.J. ("Billy") Tauzin noted that the amendment as a whole arose because "dredges [were] not subject to the same requirement as other aspects of the maritime industry," stating its purpose as "clos[ing] loopholes" in the law. *Id.* (statement of Rep. Tauzin). The amendment "has been written in cooperation with the U.S. dredging operators and grandfathers *existing* foreign-owned fleets."

*Id.* (emphasis added).[15] The October 5, 1992 House Congressional Record provides a section-by-section analysis of the Coast Guard Authorization Act, which was preceded by citation in full of the exception in question as adopted.[16] That analysis recites that "[s]ubsection (a)(2) of the bill grandfathers certain *existing* vessels that do not currently comply with these new requirements and vessels that are used as an integral part of an operation where dredging is a minority of the total costs of that operation."[17] 138 Cong. Rec. 32471 (1992) (emphasis added).

Plaintiff asserts that the reference to existing fleets and vessels demonstrates congressional intent to "preserve the status quo" for Stuyvesant Dredging Company and not to provide its foreign owner with an opportunity to expand its dredging operations. Pl.'s Br. filed Oct. 6, 2003, at 23. Moreover, plaintiff views this exception as a means for Congress to allow the STUYVESANT, one of the largest hopper dredges in the fleet at the time, to continue its operations for a limited period. Defendant counters that this legislative history is, at best, ambiguous. Defendant concedes that it could refer only to "dredging contracts then in progress," but proffers that Congress could have intended to assure the "continued economic success of Stuyvesant Dredging Co. in the U.S. dredging market." Def.'s Br. filed Oct. 3, 2003, at 16. Intervenor admonishes that plaintiff's reading of the legislative history would render superfluous the language "or to an entity in which it has an ownership interest." Intv.'s Br. filed Oct. 8, 2003, at 14. Intervenor concurs with de-

14. Defendant indicates that part of the legislative history refers to a prior version of the exception when it exempted only "the vessel STUYVESANT, official number 648540, operating under an Order of Approval granted under section 9 of the Shipping Act, 1916 (46 App. U.S.C. 808)." H.R. Rep. 102–260, at 4 (1991). The court refers only to the legislative history citing the exception language as adopted.

15. Defendant observes that Representative Tauzin did not state directly that the purpose of the exception was "protect[ing] existing dredging operations." That statement was part of a position paper issued by the House Committee on Merchant Marine and Fisheries, which Representative Tauzin directed to be incorporated into the Congressional Record. *See* 138 Cong. Rec.

15647 (1992). Moreover, in October 1991 this position statement appeared in the same form in House Report 102–260, accompanying bill H.R. 1464, in which the Stuyvesant exception extended to the vessel only, and not to any hoppers or non-hoppers. *See* H.R.Rep. No. 102–260, at 4 (1991).

16. The exact language corresponds to the session law. *See* Pub.L. No. 102–587, 106 Stat. 5084.

17. Despite following a statement of the exception as adopted, the (a)(2) reference most likely refers back to the earlier version of the exception referring to the vessel only, as the numbering corresponds best to "Sec. 7. Coastwise Law," "(a) DREDGES," "(2) EXCEPTION," in H.R. 1464. *See* H.R.Rep. No. 102–260, at 4.

fendant that no evidence is present of a clear congressional intent that would support plaintiff's position and reiterates the congressional purpose to permit Stuyvesant Dredging Company to operate in the United States.[18]

This court reads legislative history with the appropriate caution dictated by the Supreme Court. Nothing in the limited legislative history indicates a clear congressional purpose in contradiction to the plain meaning construction of the statute set forth above. Congress was "clos[ing] loopholes" and thereby limited the exceptions for STUYVESANT and/or Stuyvesant Dredging Company in each subsection of 5501(a)(2)(A). As defendant points out, the statement that the "amendment also includes a grandfather clause to protect existing dredging operations" corresponds most directly to the earlier version of the exception. However, the amendment as finally enacted with the current amended language, first was presented

to the House of Representatives. After reading the language in question, Representative Tauzin stated: "This amendment would close loopholes in the Federal law. It has been written in cooperation with the U.S. dredging operators and grandfathers existing foreign-owned fleets." 138 Cong. Rec. 15647.

An intent to grandfather in "existing vessels" and "protect existing dredging operations" is not ambiguous, as defendant argues, or inconsistent with the construction adopted. Congress consistently sought to confine foreign dredging operations. In the first instance, the legislation confined the operations to the vessel STUYVESANT only. Subsequently, Stuyvesant Dredging Company's activities were limited to hoppers documented before November 4, 1992, and to non-hoppers that would fulfill obligations under contracts (or their extensions) performed by hoppers or as temporary replacement vessels for one hopper performing a contract.

---

18. The parties have cited to a background document drafted in anticipation of the "Joint Hearing on Interpretations of Existing Ownership Requirements for U.S. Flag Dredges of the Subcommittee on Water Resources and Environment and the Subcommittee on Coast Guard and Maritime Transportation," which subsequently was held on April 30, 2003. *Available at* http://www.house.gov/transportation/water/04-30-03/04-30-03memo.html. Defendant also includes statements by individuals who testified at the April 30, 2003 hearing, including: Larry Burton, Director of the International Trade Compliance Division, Office of Regulations and Rulings, Bureau of Customs and Border Protection; Barry W. Holliday, Chief, Navigation and Operations Branch of the Corps; James W. Bean, Chairman and CEO of C.F. Bean, LLC; and Richard S. Weeks, President of the Dredging Contractors of America. *Available at* http://www.house.gov/transportation/water/04-30-03/04-30-03memo.html# WITNESSES. Given the expedited nature of this case, the court has relied on the parties to show why the supplemented materials cited in their briefs should be regarded either as legislative history of the 1992 Oceans Act or manifestation of Congress's view of the legislation post-enactment. These materials are not considered by this court because they are not part of the legislative history of 46 U.S.C. app. § 292 and do not indicate how the House of Representatives interprets the terms.

The document, which describes the background of the statute in issue, and the witnesses' statements are not appropriate for judicial notice. Fed.R.Evid. 201. The background docu-

ment and statements do not relate to legislation that has been passed by Congress. Congressional hearings regarding the statute were held in 1996, with no new legislation resulting. *See 142 Cong. Rec. S. 5589 (1996).* Plaintiff observes that Congress rejected legislation that would have permitted foreign-registered vessels to dredge in U.S. waters in 1996 and thus argues that no significance should be given to this preliminary legislative skirmishing in 2003.

Intervenor's affiant, Robert Dugas, an accountant, states that in 1992 Stuyvesant Dredging Company did not have an interest in another entity that chartered dredging vessels. Language in the background document is to the same effect. The court has been cited no authority that recognizes either an affidavit generated for litigation in 2003 or a background document created for a hearing conducted in 2003 as legislative history for an act of 1992, or evidence of Congress's approval of Customs' interpretation by virtue of utilizing the same language in new legislation.

The 2003 events on Capitol Hill concern another bill that may or may not be enacted. The parties' synopses of the hearing on April 30, 2003 (no verbatim transcript is available, and the court declines plaintiff's offer to view a videotape), depict a maelstrom. Locked in the positions that they have been advocating for over a decade (plaintiff's faction decrying the exception as forbidding the creation of any new entities and intervenor's faction extolling its U.S.-citizen ownership), the parties prove that neither is satisfied with the statutory language, as written. This contretemps does not mean, however, that the statute lacks a plain meaning.

Whether C.F. Bean, LLC, intends to develop more ventures with Stuyvesant Dredging Company or Stuyvesant with other entities is irrelevant; and no evidence has been placed into the record as to its intentions. *See supra* note 18. The court, however, cannot construe the exception in a way that could enable the limitation to swallow the amendment. If defendant and intervenor's plain meaning were accepted, and it would not be plain, the result would be that foreign entities could charter non-hoppers not yet documented for any dredging for the next 30 years. The exception would disappear because the non-hoppers could perform hopper contracts. "Strict adherence to the language and structure of [an] Act is particularly appropriate where, as here, a statute is the result of a series of carefully crafted compromises." *Community for Creative Non–Violence v. Reid*, 490 U.S. 730, 748 n. 14, 109 S.Ct. 2166, 104 L.Ed.2d 811 (1989).

### 5. *Injunctive relief*

■ To obtain permanent injunctive relief, plaintiff must also show: (1) that it will be immediately and irreparably injured; (2) that the public interest would be better served by the relief requested; and (3) that the balance of hardship on all the parties favors the protestor. *See Zenith Radio Corp. v. United States*, 710 F.2d 806, 809 (Fed.Cir.1983); *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 546 n. 12, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987) (standard for permanent injunction is essentially same as temporary injunctions, except actual success replaces need to show likelihood of success on merits).

■ An action at law only allows recovery of "bid preparation costs in a suit for damages, but not loss of anticipated profits," leaving a bid protestor irreparably harmed. *Essex Electro Eng'rs, Inc. v. United States*, 3 Cl.Ct. 277, 287 (1983), *aff'd*, 757 F.2d 247 (Fed.Cir.1985); *see also Keco Indus., Inc. v. United States*, 203 Ct.Cl. 566, 575 n. 5, 492 F.2d 1200, 1204 n. 5 (1974) (acknowledging existence of a damages remedy sometimes reason for denial of injunctive relief in federal district court); *Steinthal & Co., Inc. v. Seamans*, 455 F.2d 1289, 1302 (D.C.Cir.1971) (holding that availability of damages, which do not include lost profits, does not warrant automatic dismissal of injunction regardless of strength of claim on merits).

Defendant cites precedent for the proposition that lost profits are speculative and cannot constitute irreparable harm. In *Superior Services, Inc. v. Dalton*, 851 F.Supp. 381, 387 (S.D.Ca.1994), the district court held that "plaintiffs' best argument [for irreparable harm] is that they likely would not recover lost profits if it was determined the contract was erroneously awarded." Ultimately denying plaintiff's injunction, the district court did not find that lost profits were themselves to be speculative; rather, it was speculative to assume that plaintiffs would have been awarded the contract. *Id.* (noting that plaintiff ranked second for technical ability, but seventh for cost); *see also OAO Corp. v. United States*, 49 Fed.Cl. 478, 481 (2001) (finding slight evidence of irreparable harm, but denying injunction where likelihood of success on the merits is also minimal); *cf. United Int'l Investigative Servs., Inc. v. United States*, 42 Fed.Cl. 73, 75–76 (1998), *aff'd*, 194 F.3d 1335 (1999) (unpubl.) (denying temporary injunction for plaintiff when not deprived of opportunity to compete for award); *Minor Metals, Inc. v. United States*, 38 Fed.Cl. 379, 382 (1997) (court initially granted temporary injunction for plaintiff, withdrawn by agreement of parties, and denied subsequent injunction because plaintiff was not precluded from taking part in bidding process).

Not only are these cases distinguishable, but the proposition itself is suspect. If lost profits do not constitute irreparable harm, then protesters who are seeking to displace a putative awardee automatically fail to meet one of the four requirements for injunctive relief. The usual rule is that mere loss of money does not qualify as irreparable harm if the party can be made whole through money damages when the claim, which does not itself seek an injunction, is resolved on the merits. In those bid protests, involving contract awards—not resolicitation or cancellation or another form of relief—a protester is limited to recovery of bid preparation costs if it fails to obtain injunctive relief. Loss of anticipated profits thus can be remedied sole-

ly by injunctive relief. The protester's interests cannot be met with a suitable monetary award in these circumstances unless a permanent injunction is granted.

Plaintiff has succeeded on the merits, establishing that the Corps violated an applicable procurement regulation by considering intervenor as qualified. The public interest is served by ensuring a procurement process conforms to applicable procurement regulations. *See Essex Electro*, 3 Cl.Ct. at 288. In comparing the hardships of an injunction, intervenor is not harmed by aborting a flawed award process.

Although the Corps's interest in timely performance of the contract is mitigated by agreement of the parties, prior to this court's decision, to terminate intervenor's contract if this court finds intervenor ineligible, defendant points out that contract performance may be disrupted if the contract must be awarded to a new contractor. Intervenor's performance will be funded via a continuing appropriation, but the pending request for appropriation must be enacted before the Corps can award a new contract. Defendant asserts:

> Norfolk is potentially eligible for award of the contract in the event that Bean Stuyvesant LLC is determined not to be eligible and if funding is available in a timely manner.... Moreover, because an award to Norfolk would not be a "continuing contract," the Corps would be required to obligate the entire amount of the contract upon award. The Corps will not have the funds to do this until passage of its FY 2004 appropriations bill. Because the performance period for this work is limited to November 1, 2003 to April 30, 2004, the project may be in jeopardy if Bean Stuyvesant LLC is determined not to be eligible and passage of the FY 2004 appropriations bill is significantly delayed.

Def.'s Counter–Statement of Facts, No. 31 filed Oct. 9, 2003. The court accepts this distinction, although defendant did not argue in either of its briefs that a permanent injunction would jeopardize contract performance. As the record stands, no legal argument has been made by any party on this subject. The court recognizes the possibility that the appropriation may not pass in time, as well as the possibility that it could pass in a timely manner. Defendant has not shown that the public interest will not be served by preventing intervenor to continue at this time, and plaintiff has shown that the public interest would be served by implementing Congress' expressed intent in 1992 to "grandfather existing foreign-owned fleets."

Taking all the facts into consideration, plaintiff has established its entitlement to injunctive relief.

## CONCLUSION

Based on the foregoing, plaintiff's cross-motion for summary judgment is granted, and defendant's and intervenor's are denied. Accordingly, based on the foregoing:

1. Defendant, by and through the U.S. Army Corps of Engineers, its officers, agents, and employees, is permanently enjoined from proceeding with performance of the contract on Solicitation No. DACW54–03–B–0011 with any entity other than Norfolk Dredging Co.

2. Paragraph 10 of the Agreement Pertaining To Morehead City Harbor Dredging Cont[r]act Solicitation DACW54–03–B–0011 signed by all parties and made Ex. A to the Transcript of Proceedings in *Norfolk Dredging Co., Inc. v. United States*, No. 03–2225C (Fed.Cl. Sept. 30, 2003), is fully incorporated in this order:

> In the event the decision of the Court of Federal Claims is that Bean Stuyvesant is not eligible for award of the contract, the Government will terminate the contract awarded to Bean Stuyvesant under the terms of the clause entitled "Termination for the Convenience of the Government," and the Government and Bean Stuyvesant agree that this would be a no-cost termination.

3. The Clerk of the Court shall enter judgment for plaintiff consistent with the foregoing.

4. Counsel for defendant shall communicate by no later than 6:00 p.m. on October 14, 2003, the contents of this order to the contracting officials of the U.S. Army Corps of

Engineers and shall deliver to them a copy of this opinion and order as soon as practicable.

5. A copy of this opinion was made available to the parties this date.

**IT IS SO ORDERED.**